Delaney, J.
{¶ 1} Defendant-Appellant DHSC, LLC dba Affinity Medical Center appeals judgments made in favor of Plaintiff-Appellee Ann Wayt issued by the Stark County Court of Common Pleas.
FACTS AND PROCEDURAL HISTORY
{¶ 2} Plaintiff-Appellee Ann Wayt has been a registered nurse since 1967. She began her employment with Defendant-Appellant DHS, LLC dba Affinity Medical Center in 1987. Affinity Medical Center is a hospital located in Massillon, Ohio. During Wayt's employment with Affinity, she received outstanding performance evaluations. An Affinity employee nominated Wayt for a nursing award called the "CAMEOS of Caring Award," which Wayt won. Affinity featured Wayt's award in its advertising for the hospital. Before 2012, Wayt had never been disciplined for an employment infraction.
{¶ 3} In August 2012, Wayt was employed as a nurse in the Affinity orthopedic unit. Wayt's supervisors were Paula Zinsmeister, clinical manager of the orthopedic unit, and John McDonald, orthopedic and therapy services program director.
The Unionization
{¶ 4} In 2012, Wayt and several nurses employed by Affinity began efforts to unionize the registered nurses. The union organizers argued unionization was necessary to improve patient care and safety at Affinity, and to establish guidelines for staff to patient ratios. Wayt was a vocal supporter of the union and was viewed by some as a leader in the drive for unionization. Wayt's photograph appeared in a pro-union poster displayed in the hospital. Both the hospital management and employees agreed the issue of unionization was a divisive issue in the hospital. Hospital management was generally not in favor of unionization.
{¶ 5} On August 29, 2012, the Affinity registered nurses voted in favor of unionization.
The Patient
{¶ 6} On August 28, 2012, an elderly patient with dementia was admitted to the hospital from the emergency room. The patient suffered from a broken hip. The emergency room contacted Beth Varner, the housing supervisor, to coordinate the transfer of the patient from the emergency room to the orthopedic unit. Varner spoke with Wayt about the patient and Wayt felt the patient needed a sitter. A sitter is a hospital employee that sits with a patient with special needs, such as dementia. The sitter is assigned for the patient's safety and to address the patient's needs, but the sitter does not take over the duties of the unit nurse. Varner spoke with Susan *909 Kress, director of critical care services and medical surgical services, and stated Wayt refused to take the report on the patient due to the sitter situation. On the week of August 28, 2012, Susan Kress was acting as Wayt's supervisor because Zinsmeister was on vacation. Kress did not support the unionization efforts.
{¶ 7} Kress arranged for a sitter for the patient, but another manager selected the sitters. The sitters were Rhonda Smith and Jonalee Lesjak, nurses from the cardiovascular unit. Smith and Lesjak did not agree with the need for unionization. The patient was admitted to the orthopedic unit between 9:15 a.m. and 9:30 a.m. Kress and a student nurse, Sam Burgett were present in the patient's room when the patient arrived. Kress left after 15 minutes without seeing Wayt. Smith arrived in the patient's room at approximately the same time the patient arrived. She began charting at 10:00 a.m. At about 11:00 or 11:15 a.m., Lesjak relieved Smith for a lunch break. At 12:00 p.m., Smith returned to the patient's room to relieve Lesjak. Smith went off-duty at 4:30 p.m.
{¶ 8} During the patient's stay at Affinity, the patient suffered no adverse events due to the care from Affinity.
The Investigation
{¶ 9} On August 29, 2012, Smith reported to her manager that while she was in the patient's room, she did not observe Wayt conduct an hourly rounding on the patient that included a head to toe assessment. During a head to toe assessment, the nurse looks at the patient's skin, listens to the patient's heart, lungs, and bowel sounds, and palpates their pulses, abdomen, and legs. A nurse could complete a head to toe assessment in 15 minutes. The manager reported Smith's observation to Kress, who started an investigation into Smith's allegation. Smith told Kress that at around 10:00 a.m., Smith observed Wayt speak with the patient's family. At about 11:00 or 11:15 a.m., Lesjak relieved Smith for a lunch break. At 12:00 p.m., Smith returned to the patient's room to relieve Lesjak and Smith observed Wayt administer pain medication to the patient. At 2:00 p.m., Smith requested clean linens and personnel supplies for the patient, which Wayt brought to the room. Smith went off-duty at 4:30 p.m.
{¶ 10} Kress reported Smith's allegations to John McDonald that Smith did not see Wayt conduct a head to toe assessment on the patient. On September 4, 2012, McDonald told Paula Zinsmeister there was an allegation that Smith did not see Wayt come into the patient's room to do a head to toe assessment. McDonald and Zinsmeister did not support the unionization efforts at Affinity.
{¶ 11} On September 5, 2012, Zinsmeister and McDonald told Wayt they were pulling the patient's chart to conduct an audit. The chart reflected Wayt completed a head to toe assessment on the patient on August 28, 2012 at 9:00 a.m. Zinsmeister spoke with Sam Burgett and he reported that he observed Wayt in the patient's room shortly after the patient arrived. No one had spoken to Lesjak at this stage of the investigation. Zinsmeister spoke with Angela Boyle, Human Resources Director for Affinity. On September 6, 2012, Boyle sent an email to the division human resources director stating there was an incident of falsification of a medical record by Wayt. The email read that Wayt documented she performed a head to toe assessment of the patient at 9:00 a.m., but the patient did not arrive on the floor until 9:15 a.m. and three witness stated Wayt never conducted a head to toe assessment or entered the patient's room until noon.
The September 13, 2012 Meeting
{¶ 12} Zinsmeister informed Wayt they wanted to meet with her on September 13, 2012 to go over a safety issue with the *910 patient. The meeting was initially planned as a disciplinary proceeding, but was later changed to an investigatory meeting. Zinsmeister, McDonald, and Boyle attended the meeting representing Affinity. Also present at the meeting was Robert McKinney, a registered nurse at Affinity. He was present at the meeting as Wayt's union representative because Michelle Mohan, the national representative of the registered nurses' union could not be present. No one at the meeting told McKinney the matters discussed were confidential. Zinsmeister took notes at the meeting.
{¶ 13} At the meeting, McDonald told Wayt there were four witnesses who would report that on August 28, 2012, Wayt never entered the patient's room from the time of the patient's admission to the orthopedic unit until 12:00 p.m. when she came into the room to give the patient pain medication. Wayt did not speak at the meeting. Due to Wayt's actions in charting that she had completed a head to toe assessment without completing one, Affinity suspended Wayt due to "falsification of documentation" and "failure to comply with hospital policy." Wayt refused to sign the suspension notice but McKinney signed as the union representative.
{¶ 14} McKinney spoke to hospital employees and Michelle Mohan about what occurred during the September 13, 2012 meeting. Wayt also discussed the meeting with Mohan. On September 19, 2012, Mahon sent a letter to Boyle disputing the allegations of falsification against Wayt. Wayt provided an account of her care of the patient on August 28, 2012. Wayt stated she rounded on the patient hourly, per hospital policy. At some time between 11:00 a.m. to 1:00 p.m., Wayt came to the patient's room and saw Lesjak in the room as the sitter. Lesjak asked Wayt if she could stay in the room while she went to the restroom. Wayt agreed and completed the head to toe assessment of the patient while Lesjak was in the restroom. Wayt recorded her head to toe assessment in the patient's chart but entered the wrong time.
{¶ 15} After the September 13, 2012 meeting, Lesjak's account of August 28, 2012 was taken. At about 11:00 or 11:15 a.m., Lesjak relieved Smith for a lunch break. Between 11:00 a.m. and 12:00 p.m., Lesjak observed Wayt come into the patient's room to install an IV pump. Lesjak stated she never left the patient's room while Smith was at lunch. At 12:00 p.m., Smith returned to the patient's room to relieve Lesjak.
{¶ 16} After completing the investigation as to Wayt and the head to toe assessment, McDonald and Zinsmeister recommended that Wayt be terminated. On September 26, 2012, Affinity provided Wayt with a termination notice. After her termination, Wayt spoke with a local newspaper to give her account of the events.
The Ohio Board of Nursing Complaint
{¶ 17} After Wayt's termination, Bill Osterman, chief nursing officer, sent a complaint regarding Wayt to the Ohio Board of Nursing for the Board to determine whether to revoke or suspend Wayt's nursing license. The complaint included a supplemental information form to be completed by the employer. The supplemental information form asked the employer to answer additional questions by checking the applicable box. In question # 23, the form asked, "What happened to the patient? Check ALL that apply." In the box labeled, "Other-please specify", Osterman typed in "Neglect [sic]."
{¶ 18} Osterman also attached supporting documentation to the complaint, which consisted of a packet of everything Affinity used in the investigation to support the allegations of falsification of the patient's records. The packet included the meeting notes written by Zinsmeister documenting *911 McDonald stated four witnesses reported Wayt was not in the patient's room from the time the patient was admitted until sometime around 12:00 p.m. Another item was a statement by Kress that she was informed Wayt refused a patient from the emergency room unless the patient had a sitter. The other relevant item in the packet was a verified timeline dated September 6, 2012 written by McDonald or Zinsmeister. The timeline stated Smith reported Wayt never came into the patient's room from 9:10 a.m. to 4:30 p.m. except to give the patient pain medication at 12:00 p.m. Finally, included in the packet was a statement made by Smith on September 24, 2012 that Wayt came into the patient's room at 10:00 a.m.
{¶ 19} Osterman was aware of the September 19, 2012 letter from Mohan, but did not include the letter in the packet to the Ohio Board of Nursing.
The Job Search
{¶ 20} After Wayt's termination from her employment, she attempted to find a new job in the nursing field. She applied to 57 nursing positions and received two interviews. She informed potential employers she was terminated by Affinity due to union activity.
The National Labor Relations Board
{¶ 21} On September 26, 2012, the National Nurse Organization Committee filed a National Labor Relations Board ("NLRB") charge alleging Affinity engaged in unfair labor practices within the meaning of the National Labor Relations Act ("NLRA").
{¶ 22} On July 1, 2013, the NLRB entered its decision that Affinity violated certain sections of the NLRA by disciplining, terminating Wayt's employment, and reporting Wayt to the Ohio Board of Nursing. Affinity filed objections to the decision.
{¶ 23} On July 16, 2013, the NLRB as petitioner filed a petition for injunctive relief pursuant to Section 10(j) of the NLRA with the United States District Court for the Northern District of Ohio. Petitioner requested Wayt be reinstated to her previous job at her previous wages and other terms or conditions of her employment. The NLRB's motion for injunctive relief was granted on January 24, 2014. The court ordered Affinity to allow Wayt to return to work and to retract the report it made to the Ohio Board of Nursing.
The Return to Affinity
{¶ 24} Wayt returned to work at Affinity in February 2014. After Wayt's return to work, Mahon spoke with Boyle while in the presence of six nurses. Boyle told Mahon that just because there was a court order or just because Wayt was back at work did not mean Wayt deserved her job back or was a good nurse.
The Civil Complaint
{¶ 25} On November 6, 2012, Wayt filed a civil action in the Stark County Court of Common Pleas against Affinity, McDonald, Smith, and Jane Does alleging claims of tortious interference with employment contract, defamation, and intentional infliction of emotional distress. Wayt requested compensatory damages, punitive damages, and attorney's fees.
{¶ 26} On December 17, 2012, Affinity removed the action to the United States District Court for the Northern District of Ohio. On July 11, 2013, the District Court remanded the case back to the Stark County Court of Common Pleas.
{¶ 27} Affinity filed a motion to dismiss, or in the alternative, a motion to stay the action on September 19, 2013. Affinity argued the trial court lacked subject matter jurisdiction and Wayt failed to state a claim. Affinity contended federal law preempted Wayt's claims. On March 19, *912 2014, the trial court overruled Affinity's motion to dismiss/stay.
{¶ 28} Wayt filed a second amended complaint to add a claim of spoliation.
{¶ 29} Affinity filed a motion for summary judgment on December 1, 2014.
{¶ 30} On December 16, 2014, Wayt dismissed with prejudice her claims of tortious interference of contract and intentional infliction of emotional distress. Wayt also voluntarily dismissed McDonald and Smith as defendants.
{¶ 31} The trial court overruled Affinity's motion for summary judgment on January 16, 2015.
{¶ 32} On January 27, 2015, the matter proceeded to a jury trial on Wayt's claims of defamation and spoliation. The trial was bifurcated on the civil claims and punitive damages. At the conclusion of Wayt's case, Wayt dismissed her claim for spoliation. Wayt claimed Affinity defamed her and caused injury in three instances:
1. False statements made by McDonald in the presence of McKinney at the September 13, 2012 meeting.
2. Boyle's statement to Mohan in the presence of nurses that Wayt did not deserve her job back.
3. False written statements made by Osterman and sent to the Ohio Board of Nursing.
{¶ 33} The jury came back with a general verdict in favor of Wayt. The jury awarded Wayt noneconomic compensatory damages in the amount of $800,000. The verdict was tested by interrogatories. The jury heard evidence on the issue of punitive damages and awarded Wayt $750,000.
The Post-Trial Proceedings
{¶ 34} On February 10, 2015, Affinity filed a motion to apply applicable damages caps arguing the jury's award of noneconomic compensatory damages should be reduced to $250,000 and the punitive damages award should be reduced to $500,000 pursuant to statutory limits. Wayt responded that "injury to reputation" did not constitute a tort action subject to statutory damage caps. The trial court held an oral hearing on the parties' motions. On August 28, 2015, the trial court overruled the motion and found R.C. 2315.18 did not apply in defamation tort actions.
{¶ 35} Affinity filed a motion for new trial and judgment notwithstanding the verdict. Affinity also filed a motion to vacate the judgment based on federal preemption. The trial court overruled the motions on April 25, 2016.
{¶ 36} Wayt filed a motion for prejudgment interest, which the trial court denied on October 26, 2016.
{¶ 37} On November 22, 2016, Affinity filed a Notice of Appeal.
ASSIGNMENTS OF ERROR
{¶ 38} Affinity raises ten Assignments of Error:
{¶ 39} "I. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS AND MOTION TO VACATE BECAUSE THIS STATE ACTION IS PREEMPTED BY THE NATIONAL LABOR RELATIONS ACT.
{¶ 40} "II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR DEFAMATION AND SPOLIATION OF EVIDENCE.
{¶ 41} "III. THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING PLAINTIFF TO BASE HER DEFAMATION CLAIM UPON IRRELEVANT, INADMISSIBLE AND PREJUDICIAL EVIDENCE.
{¶ 42} "IV. THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING PLAINTIFF TO TESTIFY AS TO HER PERCEPTION AND/OR BELIEF
*913 AS TO WHY SHE WAS DENIED EMPLOYMENT OPPORTUNITIES.
{¶ 43} "V. THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING PLAINTIFF TO INTRODUCE EVIDENCE AND TESTIMONY REGARDING THE U.S. DISTRICT COURT'S ORDER THAT PLAINTIFF BE PERMITTED TO WORK PURSUANT TO NLRA STANDARDS.
{¶ 44} "VI. PLAINTIFF'S COUNSEL ENGAGED IN ATTORNEY MISCONDUCT THROUGHOUT THE ENTIRE TRIAL THAT PREJUDICIALLY INFLUENCED THE JURY.
{¶ 45} "VII. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO CHARGE THE JURY ON CONDITIONAL AND/OR QUALIFIED PRIVILEGE.
{¶ 46} "VIII. THE TRIAL COURT ABUSED IS DISCRETION IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL.
{¶ 47} "IX. THE TRIAL COURT ERRED IN DENYING BOTH DEFENDANT'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
{¶ 48} "X. THE TRIAL COURT ERRED IN NOT APPLYING THE APPLICABLE CAPS ON DAMAGES."
ANALYSIS
{¶ 49} Affinity raises ten Assignments of Error. For ease of discussion, we analyze Affinity's second and sixth Assignment of Errors with its eighth Assignment of Error. We analyze the remaining Assignments of Error separately.
I. Pre-emption
{¶ 50} Affinity argues in its first Assignment of Error the trial court erred when it denied Affinity's pre-trial motion to dismiss and post-trial motion to vacate because the National Labor Relations Act preempted Wayt's civil state claim for defamation.
Motion to Dismiss
{¶ 51} Affinity filed a motion to dismiss Wayt's complaint based on Civ.R. 12(B)(6), failure to state a claim, and Civ.R. 12(B)(1), lack of subject matter jurisdiction. Our standard of review on a Civil Rule 12(B) motion to dismiss is de novo. Huntsman v. State , 5th Dist. Stark No. 2016CA00206, 2017-Ohio-2622, 2017 WL 1710432, ¶ 20 citing Greeley v. Miami Valley Maintenance Contractors Inc. , 49 Ohio St.3d 228, 551 N.E.2d 981 (1990).
{¶ 52} A motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint. State ex rel. Hanson v. Guernsey County Bd. of Commissioners , 65 Ohio St.3d 545, 605 N.E.2d 378 (1992). Under a de novo analysis, we must accept all factual allegations of the complaint as true and all reasonable inferences must be drawn in favor of the nonmoving party. Byrd v. Faber , 57 Ohio St.3d 56, 565 N.E.2d 584 (1991). In order to dismiss a complaint pursuant to Civil Rule 12(B)(6), it must appear beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle plaintiff to relief. York v. Ohio State Highway Patrol , 60 Ohio St.3d 143, 573 N.E.2d 1063 (1991).
{¶ 53} The standard of review for dismissal for want of subject matter jurisdiction pursuant to Civil Rule 12(B)(1) is whether any cause of action cognizable by the forum has been raised in the complaint. State ex rel. Bush v. Spurlock , 42 Ohio St.3d 77, 537 N.E.2d 641 (1989). This determination involves a question of law that we review de novo.
{¶ 54} Affinity argues Wayt's civil claims are pre-empted by the NLRA because *914 her allegations of injury are based on her union activity. At the time of Affinity's motion to dismiss, Wayt's civil claims were defamation, tortious interference with employment contract, and intentional infliction of emotional distress. Only the claim of defamation went forward for trial. Affinity refers to Section 7 of the NLRA, which states that employees have the right to self-organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activity for mutual aid and protection. Section 8 of the NLRA makes it an unfair labor practice for an employer to restrain or coerce employees in the exercise of their rights under Section 7. Affinity contends the standard set out by the United States Supreme Court in San Diego Building Trades Council, etc. v. Garmon , 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) requires the state court to defer to the NLRB on Wayt's civil claim because it is related to her union activity.
{¶ 55} In Garmon , the U.S. Supreme Court was asked whether litigation between a union and employer regarding unfair labor practices was within the jurisdiction of the NLRB or the state court. The U.S. Supreme Court held:
The Court emphasized that it was for the Board and the Congress to define the 'precise and closely limited demarcations that can be adequately fashioned only by legislation and administration,' while '(o)ur task is confined to dealing with classes of situations.' At 242, 79 S.Ct. at 778. In this respect, the Court concluded that the States need not yield jurisdiction 'where the activity regulated was a merely peripheral concern of the Labor Management Relations Act * * * (o)r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.' At 243-244, 79 S.Ct. at 779.
Linn v. United Plant Guard Workers of America, Local 114 , 383 U.S. 53, 59, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966). The U.S. Supreme Court further clarified Garmon in Local 100 of United Ass'n of Journeymen and Apprentices v. Borden , 373 U.S. 690, 693-694, 83 S.Ct. 1423, 1425, 10 L.Ed.2d 638 (1963) :
'(I)n the absence of an overriding state interest such as that involved in the maintenance of domestic peace, state courts must defer to the exclusive competence of the National Labor Relations Board in cases in which the activity that is the subject matter of the litigation is arguably subject to the protections of s 7 or the prohibitions of s 8 of the National Labor Relations Act. This relinquishment of state jurisdiction * * * is essential 'if the danger of state interference with national policy is to be averted,' * * * and is as necessary in a suit for damages as in a suit seeking equitable relief. Thus the first inquiry, in any case in which a claim of federal preemption is raised, must be whether the conduct called into question may reasonably be asserted to be subject to Labor Board cognizance.'
Linn, supra , at 59-60, 86 S.Ct. 657.
{¶ 56} The trial court considered the " Garmon Rule" as raised by Affinity, but found that additional case law by the U.S. Supreme Court supported the ruling that the NLRA did not divest a state court of subject matter jurisdiction over a common law tort action for damages even where such conduct constitutes an unfair labor practice. In Linn v. United Plant Guard Workers of America, Local 114 , 383 U.S. 53, 59, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966), a company manager brought a civil action against a union and others for damages caused by alleged defamation during *915 a labor organization campaign. The federal court dismissed the case based on pre-emption. The Linn Court found the defamation action was not within the exclusive jurisdiction of the NLRB. It noted the NLRB had considered strong statements and language during labor controversies, even if the statements were erroneous or used to defame one of the parties to the dispute. Id. at 61, 86 S.Ct. 657. The Court found the NLRB, however, "indicated that its decisions would have been different had the statements been uttered with actual malice, 'a deliberate intention to falsify' or 'a malevolent desire to injure.' " Id. The Court summarized that "although the Board tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees, it does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false." Id. The Court found even though the claim for defamation arises out of a labor dispute, that does not in and of itself constitute an unfair labor practice. Id. at 63, 86 S.Ct. 657. If a malicious or false statement is made during a union campaign and affects the campaign, the NLRB looks to the misleading or coercive nature of the statement. Id. Whether the defamatory quality of the statement causes damage to an individual's reputation-"whether he be an employer or union official"-is irrelevant to the function of the NLRB. Id. The Linn Court found there was an overriding state interest in protecting its residents from malicious libels that is "deeply rooted in local feeling and responsibility." Id. The state court can provide remedies designed to compensate the victim and enable the victim to vindicate his or her reputation. Id. ; see also United Construction Workers, etc. v. Laburnum Construction Corp. , 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed 1025 (1954).
{¶ 57} The facts of the present case fit squarely within the law stated in Linn . In Wayt's complaint, she alleged malicious libel that caused injury to her reputation. That the statements occurred during a union campaign does not abrogate the state's overriding interest in protecting its residents from defamation.
{¶ 58} Accepting all factual allegations of the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, we find Wayt could prove a set of facts in support of the claim that would entitle her to relief. Further, Wayt alleged a cause of action the state court had authority to decide pursuant to Garmon and Linn .
Motion to Vacate
{¶ 59} After the general verdict in favor of Wayt and the journalization of the verdict, Affinity filed a motion to vacate the judgment pursuant to Civ.R. 60(B). In the motion, Affinity again raised the argument that the trial court lacked subject matter jurisdiction because the NLRA pre-empted Wayt's state claim for defamation. The trial court denied Affinity's motion based on its previous judgment denying Affinity's motion to dismiss or stay Wayt's complain based on pre-emption.
{¶ 60} The decision whether to grant a motion for relief from judgment under Civ.R. 60(B) lies within the trial court's sound discretion. Griffey v. Rajan , 33 Ohio St.3d 75, 514 N.E.2d 1122 (1987). In order to find abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).
{¶ 61} A party seeking relief from judgment pursuant to Civ.R. 60(B) must show: "(1) a meritorious defense or claim to present if relief is granted; (2) entitlement to relief under one of the grounds set forth in Civ.R. 60(B)(1)-(5); and (3) the motion must be timely filed."
*916 GTE Automatic Electric, Inc. v. ARC Industries, Inc. , 47 Ohio St.2d 146, 351 N.E.2d 113 (1976), paragraph two of the syllabus. A failure to establish any one of the three requirements will cause the motion to be overruled. Rose Chevrolet, Inc. v. Adams , 36 Ohio St.3d 17, 20, 520 N.E.2d 564 (1988) ; Argo Plastic Prod. Co. v. Cleveland , 15 Ohio St.3d 389, 391, 474 N.E.2d 328 (1984).
{¶ 62} Based on our decision to affirm the trial court's denial of Affinity's motion to dismiss the complaint, we also find the trial court did not abuse its discretion when it denied Affinity's motion to vacate the judgment. Affinity's motion to vacate the judgment was based on the same argument that Wayt's claim for defamation was pre-empted by the NLRA. The trial court found, and we agree, Wayt's state claim for defamation was not pre-empted by the NLRA as held by the U.S. Supreme Court in Linn, supra .
{¶ 63} Also in its motion to vacate the judgment, Affinity raised for the first time the argument that Wayt's claim was pre-empted by Section 301 of the Labor-Management Relations Act. The LMRA pre-empts a state claim if the state claim requires interpretation of a collective bargaining agreement. The trial court found Wayt's claim for defamation did not turn on the interpretation of a collective bargaining agreement, nor was there a collective bargaining agreement in place at the time the cause of action accrued. We agree with the trial court's reasoning and find no abuse of discretion in finding Wayt's claims were not pre-empted by the NLRA or LMRA.
{¶ 64} Affinity's first Assignment of Error is overruled.
III. Admission of Evidence-Unfair Labor Practices
{¶ 65} Affinity contends in its third Assignment of Error that the trial court abused its discretion when it allowed Wayt to present evidence during the trial regarding her labor dispute. Affinity states that by allowing Wayt to present evidence about alleged unfair labor practices by Affinity, the trial court permitted Wayt to try her unfair labor practice charge within the defamation case.
{¶ 66} At trial, Affinity argued:
AFFINITY: Judge, the issue in this case in not the termination. It's the defamation. And, again, that's the whole concern about not staying this action. That is getting lost in the examination which I believe is really irrelevant to the issues in this case. It's the defamation, not the termination.
* * *
WAYT: It's absolutely inextricably interwoven. The reason they terminated her is because of her union support and they defamed her so they could support the termination.
AFFINITY: Judge, if that is case, then I am moving for a mistrial right now because it was represented to you that that case was wholly separate and apart from the defamation action and that's the reason this case should not have stayed, that the termination-was represented to you by the Plaintiff that the termination had nothing to do with this case. That it was something separate and apart and that's why it is distinguishable from the other action that's going on. You were just told that it was inextricably related an intertwined. I'm moving for a mistrial, Your Honor, based upon that representation by Plaintiff's counsel to this Court.
WAYT: Well, apparently Mr. Mazgaj did not listen to my opening. Because I did explain that the reason they fired her was because they couldn't fire her for her union support and they defamed her and made things up to support her termination. * * *
*917 (T. 871-873). The trial court overruled Affinity's motion for a mistrial. (T. 874).
{¶ 67} Generally, decisions regarding the admissibility of evidence are within the broad discretion of the trial court. McManaway v. Fairfield Med. Ctr. , 5th Dist. Fairfield No. 05 CA 34, 2006-Ohio-1915, 2006 WL 1012465, ¶ 22 citing Beard v. Meridia Huron Hosp. , 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, at ¶ 20, citing State v. Hymore , 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). A decision to admit or exclude evidence will be upheld absent an abuse of discretion. Id.
{¶ 68} Affinity states the remedy in this case is a new trial. In support of its argument, Affinity refers this Court to Wargo v. Susan White Anesthesia, Inc. , 8th Dist. Cuyahoga No. 96410, 2011-Ohio-6271, 2011 WL 6152967. In Wargo , a plaintiff brought a medical malpractice claim and later amended the complaint to include a claim for fraudulent concealment, requesting punitive damages. The defendant doctor filed a motion for summary judgment on all claims, which the trial court denied. The matter went to trial and the jury found in favor of the plaintiff, awarding compensatory damages and punitive damages. Id. at ¶ 6. The doctor defendant appealed the verdict and the trial court's decision to deny his motion for summary judgment as to fraudulent concealment and punitive damages. Id. at ¶ 8. Upon the de novo review, the court found plaintiff raised no genuine issues of material fact that the defendant doctor fraudulently concealed the incident involved in the medical malpractice claim. Id. at ¶ 23. The court found the trial court erred when it failed to grant summary judgment and allowed the fraudulent concealment claim go to the jury, thereby prejudicing the malpractice claim by focusing on the alleged fraudulent concealment. Id. The court remanded the matter for a new trial on the plaintiff's medical malpractice claim. Id.
{¶ 69} We do not find Wargo supports Affinity's argument that it is entitled to a new trial based on the admission of evidence of alleged unfair labor practices. In Wargo , the plaintiff pursued two separate claims, one of which the court found there were no genuine issues of material fact to support. Wayt tried only a defamation claim, not two separate claims as in the Wargo case. Wayt did not pursue a wrongful termination claim, requesting lost wages or damages. The trial court instructed the jury that the matter was not a wrongful termination case. (T. 1680-1681). The "presumption always exists that the jury has followed the instructions given to it by the trial court." Peters v. Rock-Tenn Co. , 5th Dist. Delaware No. 10CAE040030, 2011-Ohio-3949, 2011 WL 3503246, ¶ 51 quoting Pang v. Minch , 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus.
{¶ 70} We agree with the trial court that the background of the labor dispute was admissible evidence as to the issue of whether Affinity defamed Wayt, particularly as to whether Affinity acted with actual malice. To establish a claim for defamation, a plaintiff must show: (1) a false statement of fact was made about the plaintiff; (2) the statement was defamatory; (3) the statement was published; (4) the plaintiff suffered injury as a proximate result of the publication and (5) the defendant acted with the requisite degree of fault in publishing the statement. Jamison v. Galena , 2015-Ohio-2845, 38 N.E.3d 1176, ¶ 52 (5th Dist.) citing Am. Chem. Soc. v. Leadscope, Inc. , 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832. The requisite degree of fault the plaintiff must establish is dependent upon the classification of the defamation.
*918 {¶ 71} In this case, Wayt claimed Affinity published false statements about her because of her unionization efforts. Affinity does not raise on appeal the argument that Wayt's defamation claim did not arise out of a labor dispute. For defamation claims founded upon statements made by and about participants in a labor dispute, the courts have established a stricter rule for proving defamation. In a defamation case arising out of a labor dispute, the plaintiff must demonstrate by clear and convincing evidence that the defendant acted with actual malice when making the defamatory statements. Heinlen v. Ohio Civ. Serv. Employees Ass'n , 3rd Dist. Marion No. 9-01-58, 2002 WL 4628655, *3 citing Dale v. Ohio Civil Serv. Employees Ass'n. , 57 Ohio St.3d 112, 567 N.E.2d 253 (1991) ; Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America , 6 Ohio St.3d 369, 453 N.E.2d 666 (1983).
{¶ 72} "Actual malice 'cannot be implied from the character and content of a publication. * * * It is not sufficient for a libel plaintiff to show that an interpretation of facts is false; rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity.' " Jacobs v. Budak , 11th Dist. Trumbull No. 2007-T-0033, 2008-Ohio-2756, 2008 WL 2332543, ¶ 64 (11th Dist.) quoting A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 73 Ohio St.3d 1, 13, 651 N.E.2d 1283 (1995), citing Jacobs v. Frank , 60 Ohio St.3d 111, 118-119, 573 N.E.2d 609 (1991). Furthermore, "[m]ere negligence is not enough to establish actual malice." Id. , citing Dale at 118, 567 N.E.2d 253. "Thus, 'reckless conduct is not measured by whether a reasonably prudent man * * * would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " Id. , citing St. Amant v. Thompson , 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).
{¶ 73} Because this case is a defamation action based on a labor dispute, it was not enough for Wayt to show the jury that Affinity's interpretation of the facts was false. Wayt was required to prove with convincing clarity that Affinity was aware of the high probability of the falsity when it made the statements Wayt alleged were defamatory. There must be sufficient evidence to permit the conclusion that Affinity in fact entertained serious doubts as to the truth of its publication. The evidence presented by Wayt as to the unfair labor dispute was relevant to show Affinity was aware of the high probability of the falsity of the statements Affinity made about Wayt's work performance.
{¶ 74} There was no dispute in this case that before August 2012, Wayt had a superior employment record while she worked for Affinity. Wayt was nominated for and received a nursing award, which Affinity used in its advertisements. All parties agreed that Wayt was a vocal supporter of unionization. There was also no dispute of fact that that unionization was a contentious issue between staff and administration. On August 28, 2012, the patient was admitted under Wayt's care. On August 29, 2012, the Affinity registered nurses voted in favor of unionization. On August 29, 2012, Affinity began the investigation into Wayt's care for the patient. Early in the investigation, allegations were made that Wayt did not come into the patient's room from the time of her admission, approximately 9:30 a.m., to 4:30 p.m. At the September 13, 2012 meeting where Wayt was given a notice of suspension, Jason McDonald stated that four witnesses reported that Wayt was not in the room from the time the patient was admitted until sometime around 12:00 p.m. when she gave the patient pain medication. After the *919 September 13, 2012 meeting, Affinity continued its investigation and became aware that Wayt was with the patient at 10:00 a.m., 12:00 p.m., and 2:00 p.m. On September 19, 2012, Wayt provided Affinity with her statement of what occurred on August 28, 2012, refuting the allegations. On September 26, 2012, Affinity terminated Wayt's employment. After Wayt's termination, Affinity sent a complaint to the Ohio Board of Nursing that included a knowingly false statement that Wayt was not in the patient's room from the time of the patient's admission to 4:30 p.m., when further investigation showed Wayt was indeed with the patient at 10:00 a.m., 12:00 p.m., and 2:00 p.m.
{¶ 75} Considering the totality of the circumstances of Wayt's exemplary performance evaluations, Wayt's unionization efforts, Affinity's faulty investigation, and the timing of Affinity's termination of Wayt coinciding with unionization, we find the issue of the labor dispute to be relevant to the issue of whether Affinity was aware of the high probability of falsity of the statements and as a motive for termination. The submission of the complaint to the Ohio Board of Nursing, that included statements proven false by Affinity's own investigation, could permit the jury to conclude that Affinity in fact entertained serious doubts as to the truth of its publication. We find no abuse of discretion because the evidence was relevant to the issue of actual malice.
{¶ 76} Affinity's third Assignment of Error is overruled.
IV. Admission of Wayt's Testimony-Employment Opportunities
{¶ 77} Affinity argues in its fourth Assignment of Error that the trial court abused its discretion by denying its motion in limine to allow Wayt testify about her lost job opportunities and job applications.
{¶ 78} Affinity filed a pre-trial motion in limine to preclude Wayt from presenting testimony that she was denied employment opportunities or referring to potential employer's comments. Affinity argued Wayt had no evidence the alleged defamatory statements made by Affinity had any impact on her inability to find employment. (T. 8). Allowing Wayt to testify to that would require the jury to speculate that Wayt did not receive a job offer because of the alleged defamatory statements. (T. 9). Affinity argued Wayt told her potential employers that she was terminated because of her union activity. (T. 8). The trial court ruled Wayt could present evidence of her efforts to secure other employment. (T. 7). The trial court, however, would not permit Wayt to present hearsay evidence as to what potential employers said to her. (T. 7). The trial court found that if Wayt presented evidence that she sent out multiple applications to secure other employment, it could be circumstantial evidence for the jury to make a reasonable inference why Wayt did not receive a job offer. (T. 8).
{¶ 79} Before Wayt's testimony on direct, Affinity renewed its motion as limine as to Wayt's job applications. (T. 1637). The trial court took the matter under consideration. Wayt testified after her termination from Affinity, she submitted 57 job applications to different employers. (T. 1684). She only submitted applications to positions with job openings. (T. 1684). She received two interviews, but no job offers. (T. 1684-1685). On cross-examination, Wayt testified that all the job applications asked the reason for her termination. (T. 1738). Wayt indicated she was terminated for union activity. (T. 1738).
{¶ 80} Affinity also raised the argument its motion for new trial. The trial court stated in its April 25, 2016 judgment entry denying Affinity's motion for new trial:
The Court concludes that Plaintiff's failed attempts to regain employment *920 were probative, and that the concerns Defendant addresses go to the weight to be given the evidence, not the admissibility. It was well within the jury's providence to determine what weight, if any, to assign to the fact that Plaintiff unsuccessfully sought other employment.
{¶ 81} Affinity argues on appeal that Wayt's testimony as to her lost job opportunities left the jury to speculate as to why Wayt was not offered a job. We agree with the trial court's conclusion that Wayt's testimony that she applied for jobs after her termination and did not receive any job offers goes to the weight of the evidence, not admissibility. Affinity had the opportunity to cross-examine Wayt as to her knowledge of why she did not receive any job offers. The trial court previously ruled that any hearsay testimony about what a potential employer told her was inadmissible. Wayt testified on cross-examination that she stated on her job applications that she was terminated because of her union activity. It was the jury's role to weigh the evidence presented in Wayt's direct examination and cross-examination as to why Wayt did not receive any job offers.
{¶ 82} Affinity's fourth Assignment of Error is overruled.
V. Admission of Evidence-Section 10(j) Injunctive Relief
{¶ 83} In Affinity's fifth Assignment of Error, Affinity contends the trial court abused its discretion when it allowed Wayt to present evidence regarding the U.S. District Court's judgment entry granting injunctive relief pursuant to Section 10(j). The Section 10(j) decision ordered Affinity to allow Wayt to return to her prior employment.
{¶ 84} Affinity initially filed a motion in limine regarding the Section 10(j) order. At the start of trial. The trial court found the Section 10(j) order was relevant to explain Wayt's return to work and Affinity's withdrawal of its complaint to the Ohio Board of Nursing. (T. 12). It further found the Section 10(j) order went to the issue of actual malice. (T. 12). While the effect of the Section 10(j) order was relevant, the trial court ruled it was not appropriate for the jury to see the entire decision issued by the U.S. District Court. (T. 12). The trial court stated it would give a limiting instruction to the jury that it would not see the whole judgment entry and the Section 10(j) order was not a final decision on the merits of Wayt's unfair labor practices claim before the NLRB, but a preliminary injunctive type of relief. (T. 12).
{¶ 85} During Wayt's opening statement, her counsel told the jury that it would hear evidence that Wayt was back at work at Affinity because of a court order. (T. 192). Affinity objected and moved for a mistrial. (T. 192-193). The trial court overruled Affinity's objection and gave a curative instruction to the jury:
Ladies and gentlemen, Mr. Zimmerman made a statement that the reason Ann was reinstated at Affinity was due to a court order. You are instructed that that is only by way of explanation, that that was a preliminary proceeding and that the issues in that case have not been ultimately resolved. It is only for the purpose of you understanding that she is now working back at Affinity. That the issues concerning whether or not she was terminated appropriately or not is not an issue in this case and there has not been a final disposition regarding that in the other case.
(T. 194-195).
{¶ 86} During Angela Boyle's cross-examination, counsel for Wayt asked if Wayt received another paycheck until she was ordered back to Affinity. (T. 1056). Affinity objected on the basis that the question violated the trial court's ruling on the motion in limine that Wayt was ordered back to work. (T. 1056). Affinity contended the *921 question gave the jury the impression that Wayt's termination was improper and she was ordered back to work. (T. 1057). The trial court sustained the objection on the grounds of relevancy because Wayt did not claim wrongful termination. (T. 1057). The trial court gave a curative instruction to the jury to reiterate that Wayt returned to work at Affinity because of another court's preliminary order. The preliminary order was not dispositive of whether or not she was terminated for cause. (T. 1060).
{¶ 87} Affinity contends evidence regarding the Section 10(j) order was irrelevant and inadmissible. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Although relevant, evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). State v. Vandyne , 5th Dist. Guernsey No. 16CA10, 2017-Ohio-584, 2017 WL 777746, ¶ 32. Generally, decisions regarding the admissibility of evidence are within the broad discretion of the trial court. McManaway v. Fairfield Med. Ctr. , 5th Dist. Fairfield No. 05 CA 34, 2006-Ohio-1915, 2006 WL 1012465, ¶ 22 citing Beard v. Meridia Huron Hosp. , 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, at ¶ 20, citing State v. Hymore , 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). A decision to admit or exclude evidence will be upheld absent an abuse of discretion. Id.
{¶ 88} Affinity argues the Section 10(j) order was irrelevant and therefore inadmissible because it was (1) not related to Wayt's defamation claim and (2) an interim order that did not decide the merits. We first find the trial court did not abuse its discretion when it found the Section 10(j) order was relevant and admissible to explain why Wayt was working at Affinity after her termination. Without that information, the jury would have been free to speculate why Affinity would terminate Wayt for the reasons it listed to then allow her to return to work, especially in light of her claim of defamation. Such speculation could have been harmful to either Affinity or Wayt.
{¶ 89} Further, the Section 10(j) order was relevant to Wayt's claim of defamation. Wayt claimed Angela Boyle made a defamatory statement about Wayt after she returned to work. Wayt returned to work at Affinity in February 2014. After Wayt's return to work, Mahon spoke with Boyle while in the presence of six nurses. Boyle told Mahon that just because there was an order or just because Wayt was back at work did not mean Wayt deserved her job back or was a good nurse.
{¶ 90} We next find the trial court sufficiently instructed the jury as to the procedural meaning of the Section 10(j) order through its curative instructions. The "presumption always exists that the jury has followed the instructions given to it by the trial court." Peters v. Rock-Tenn Co. , 5th Dist. Delaware No. 10CAE040030, 2011-Ohio-3949, 2011 WL 3503246, ¶ 51 quoting Pang v. Minch , 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus. The trial court gave at least two curative instructions regarding the Section 10(j) order. The trial court stated in its curative instructions the order was a preliminary proceeding conducted by another court that did not decide the merits. The trial court further explained the case presented by Wayt did not involve wrongful termination. The only issue before the jury was a claim of defamation. We find the trial court clearly instructed the jury the Section 10(j) order was an interim order that did not decide the merits and *922 presume the jury followed the instruction given by the trial court.
{¶ 91} We overrule Affinity's fifth Assignment of Error.
VII. Jury Instructions-Conditional and/or Qualified Privilege
{¶ 92} Affinity argues in its seventh Assignment of Error that the trial court erred as a matter of law when it failed to correctly instruct the jury that Affinity was entitled to a conditional or qualified privilege. Affinity further claims the trial court should have also instructed the jury that it was immune from all liability for statements it published to the Ohio Board of Nursing. Affinity claims the errors require a new trial.
Qualified Privilege
{¶ 93} In McKenna v. Mansfield Leland Hotel Co. , 55 Ohio App. 163, 167, 9 N.E.2d 166 (5th Dist.1936), this court summarized the concept of "qualified privilege" as follows:
A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. 17 Ruling Case Law, 341.
The preponderance of authority supports the view that communications between an employer and an employee, or between two employees, concerning the conduct of a third employee or former employee, are qualifiedly privileged, and thus, even though such a communication contain[s] matter defamatory to such other or former employee, he cannot recover in the absence of sufficient proof of actual malice to overcome the privilege of the occasion. 98 A.L.R., 1301, annotation.
{¶ 94} The Ohio Supreme Court explained that, if a plaintiff has made out a prima facie case of defamation, the defendant may invoke the defense of qualified privilege. Jascar Ents., L.L.C. v. Body by Jake Ents., L.L.C. , 2015-Ohio-3281, 40 N.E.3d 689, ¶ 13 (9th Dist.) citing Hahn v. Kotten, 43 Ohio St.2d 237, 243, 331 N.E.2d 713 (1975). The elements of a qualified privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." Id. at 244, 331 N.E.2d 713, quoting 50 American Jurisprudence 2d, Libel and Slander, Section 195, at 698.
{¶ 95} In its motion for summary judgment, Affinity argued it was entitled to a finding as a matter of law that it was entitled to the defense of "qualified privilege" for the September 13, 2012 meeting. The trial court denied the motion for summary judgment finding there were genuine issues of material fact for trial.
{¶ 96} At trial, Affinity again requested the trial court determine as a matter of law that the qualified privilege applied to the September 13th meeting. (T. 877). Affinity stated the evidence presented at trial demonstrated that Robert McKinney was at the September 13, 2012 meeting as Wayt's union representative. (T. 877). Wayt responded that the trial court could not as a matter of law grant an affirmative defense of qualified privilege. Affinity had to prove they acted in good faith and did not state things with actual malice. (T. 877). Affinity responded the trial court was to determine as a matter of law whether a qualified privilege applied to the subject matter of the September 13, 2012 meeting. (T. 878). It was the jury's role to then determine whether Affinity met the burden and whether the statements were *923 made without actual malice. (T. 878-879). The trial court found that evidence was presented and would give the jury an instruction as to qualified privilege. (T. 878). The trial court again notified the parties it would give an instruction as to qualified privilege. (T. 1363).
{¶ 97} The trial court instructed the jury as follows:
The parties agree that at the September 13, 2012 meeting, Robert McKinney was present as a union representative and not within the course and scope of his employment at Affinity.
The defendant claims that any statement about the plaintiff from the September 13, 2012 meeting was privileged. This is an affirmative defense. The burden of proving an affirmative defense by a preponderance of the evidence is on the defendant.
The defendant claims that it is not liable to the plaintiff because the defamatory statements were privileged having been made in the context of plaintiff's employment and was only published to individuals with a common interest and any communication about the plaintiff was reasonably calculated to protect or further that common interest. A statement is privileged only if it was made without actual malice (as defined previously), did not go beyond the purpose of the privilege and was published to persons with a legitimate interest in the statement, and at a proper time and in a proper manner.
Should you conclude that Affinity failed to prove it is entitled to the defense of qualified privilege for the alleged false statements, you need not consider this jury instruction.
However, should you find that Affinity did prove by a preponderance of the evidence that it is entitled to the defense of qualified privilege for the alleged false statements, you must consider the following instruction:
Plaintiff, Ann Wayt can defeat the defense of qualified privilege if she presented clear and convincing evidence that the statements were made with actual malice.
(T. 1854-1855).
{¶ 98} Affinity argues it was error for the trial court to instruct the jury to determine whether Affinity was entitled to a qualified privilege for the statements made at the September 13, 2012 meeting. Affinity states the question of whether the defendant is entitled to a qualified privilege is a question of law for the trial court to decide. The Ohio Supreme Court held that "where the circumstances of the occasion for the alleged defamatory communications are not in dispute, the determination of whether the occasion gives the privilege is a question of law for the court." A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. , 73 Ohio St.3d 1, 7, 651 N.E.2d 1283 (1995) citing Worrell v. Multipress, Inc. , 45 Ohio St.3d 241, 248-249, 543 N.E.2d 1277 (1989).
{¶ 99} In this case, the circumstances of the occasion for the alleged defamatory communications were in dispute. The presence of Robert McKinney at the September 13, 2012 meeting created an issue of fact whether the qualified privilege applied to the meeting. Further, even if the trial court had decided as a matter of law a qualified privilege applied to the September 13, 2012 meeting, the qualified privilege may be defeated if the plaintiff proves by clear and convincing evidence that the defendant acted with actual malice. Jacobs v. Frank , 60 Ohio St.3d 111, 573 N.E.2d 609 (1991), paragraph two of the syllabus.
{¶ 100} The jury was asked by interrogatory whether Wayt proved by the preponderance of the evidence that the statement, *924 "There are 4 other witnesses that report Ann was not in the room from the time the patient was admitted until sometime around noon when she came in to give the patient pain medication," was made by Affinity during the September 13, 2012 meeting and the statement was defamatory. Eight jurors responded in the affirmative. The jury was next asked by interrogatory whether Wayt proved by clear and convincing evidence that Affinity acted with actual malice in making that statement at the September 13, 2012 meeting. Eight jurors responded in the affirmative.
{¶ 101} The jury instructions informed the jury that should they find Affinity proved by a preponderance of the evidence that it was entitled to the defense of qualified privilege for the alleged false statements, they must consider whether Wayt could defeat the defense of qualified privilege if she presented clear and convincing evidence that the statements were made with actual malice. The jury interrogatories show the jury found Affinity was entitled to the qualified privilege for the September 13, 2012 meeting, but the statements were made with actual malice, thereby defeating the qualified privilege. Under these circumstances, a new trial is not warranted based on the jury instructions as to qualified privilege.
Immunity
{¶ 102} Affinity next argues the jury should have been instructed that Affinity was immune from liability for the statements contained in the documents sent to the Ohio Board of Nursing. Pursuant to R.C. 4723.341(B), in the absence of fraud or bad faith, no person reporting to the board of nursing shall be subject to liability in damages in a civil action for injury, death, or loss to person or property. The jury was asked by interrogatory whether Wayt proved by a preponderance of the evidence that Affinity, through Bill Osterman, acted with fraud or in bad faith in making any of the five statements referenced in the jury instructions about Wayt to the Ohio Board of Nursing. The eight jurors answered in the affirmative.
{¶ 103} We find no error warranting a new trial because of the jury instructions as to qualified privilege or immunity. Affinity's seventh Assignment of Error is overruled.
II., VI., and VIII. Motion for New Trial
{¶ 104} Affinity contends in its eighth Assignment of Error that the trial court abused its discretion when it denied Affinity's motion for new trial. We consider Affinity's second, sixth, and eighth Assignments of Error together because they are related to Affinity's motion for new trial.
{¶ 105} In its motion for new trial, Affinity presented eight reasons for granting a new trial due to the prejudicial effect of several irregularities during trial:
1) Affinity's defense to Wayt's defamation claim was prejudicially tainted by the improper references to Wayt's NLRB proceedings;
2) Wayt was erroneously allowed to present evidence as to the Section 10(j) order;
3) Wayt was erroneously allowed to present evidence as to her unsuccessful job applications;
4) Misconduct by counsel for Wayt influenced the jury verdict;
5) The jury was not instructed that Affinity was entitled to a qualified privilege;
6) The manner in which the jury interrogatories were written was prejudicial to Affinity;
7) The jury verdict was not sustained by the weight of the evidence; and
8) The damages awarded to Wayt were excessive and given under influence of passion or prejudice.
*925 {¶ 106} Affinity's motion for new trial was premised on the following grounds in Civ.R. 59 :
(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
(2) Misconduct of the jury or prevailing party;
* * *
(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;
* * *
(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case.
* * *
{¶ 107} The granting of a Civ.R. 59(A) motion for new trial is generally left to a trial court's sound discretion and the decision will not be reserved absent an abuse of that discretion. State Farm Mut. Auto. Ins. Co. v. Williams , 5th Dist. Licking No. 13-CA04, 2013-Ohio-3884, 2013 WL 4806467, at ¶ 22. An abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, unconscionable, or arbitrary. Blakemore v. Blakemore , 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).
Irregularity of Proceedings
{¶ 108} In Affinity's appellate brief, Affinity raised arguments as to the irregularity of the proceedings as separate Assignments of Error. Specifically, Affinity separately argued the jury was prejudiced by the evidence as to the NLRB proceedings, evidence as to Wayt's unsuccessful job applications, and the reference to the Section 10(j) order. It also argued the jury instructions were incorrect. We have addressed those Assignments of Error. We consider the remaining arguments raised in Affinity's motion for new trial.
Attorney Misconduct
{¶ 109} Affinity contends in its sixth Assignment of Error that the misconduct of Wayt's counsel during the jury trial warrants a new trial. Affinity cites to multiple instances of what it argues demonstrates the misconduct of Wayt's counsel during trial.
{¶ 110} A trial atmosphere tainted with passion and prejudice is grounds for reversal. Pierce v. Durrani , 2015-Ohio-2835, 35 N.E.3d 594, ¶¶ 17-18 (1st Dist.) citing Wynn v. Gilbert , 1st Dist. Hamilton No. C-060457, 2007-Ohio-2798, 2007 WL 1650021, ¶ 34. Remarks or arguments not supported by the evidence and designed to arouse passion or prejudice to the extent that there is a substantial likelihood that the jury may be misled are improper. Id. citing Roetenberger v. Christ Hosp. , 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441, ¶ 9 (1st Dist.) ; Furnier v. Drury , 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, ¶ 10 (1st Dist.). Counsel must refrain from unwarranted attacks on opposing counsel, the opposing party, and the witnesses. Id. citing Roetenberger at ¶ 9 ; Furnier at ¶ 10. The trial court has a duty to see that counsel's statements stay within proper limits and to prohibit counsel from creating an atmosphere of passion and prejudice. Id. citing Roetenberger at ¶ 9 ; Furnier at ¶ 10. It should not permit abusive conduct, and it has a duty to intervene sua sponte to correct the prejudicial effect of misconduct. Id. citing Pesek v. Univ. Neurologists Assn., Inc. , 87 Ohio St.3d 495, 501, 721 N.E.2d 1011 (2000) ; Fehrenbach , 1st Dist. Hamilton No. C-100730, 2011-Ohio-5481, 2011 WL 5119059, at ¶ 19.
*926 {¶ 111} In its judgment entry denying Affinity's motion for new trial, the trial court addressed each of the instances Affinity identified as misconduct by Wayt's counsel. The trial court first found Wayt's limited references to Section 10(j) were proper and did not constitute misconduct. In the fifth Assignment of Error, we affirmed the trial court's admission of such evidence. The trial court next reviewed the trial transcript and did not agree with Affinity's characterization that Wayt requested the jury send a message to union supporters or that Paula Zinsmeister was not being fair to the jury. We have thoroughly reviewed the transcript and agree with the trial court's conclusion.
{¶ 112} Affinity next argued Wayt improperly used depositions to impeach witnesses. The trial court found, and we concur, that the trial court sustained Affinity's objections when Wayt made references to deposition testimony without proper impeachment. The trial court noted that in reference to other instances where Affinity alleged attorney misconduct, the trial court sustained Affinity's objections to said misconduct. The trial court instructed the jury at the start of trial that if the trial court sustains an objection, the jury was not permitted to speculate about what the answer would have been or why the objection was sustained. The "presumption always exists that the jury has followed the instructions given to it by the trial court." Peters v. Rock-Tenn Co. , 5th Dist. Delaware No. 10CAE040030, 2011-Ohio-3949, 2011 WL 3503246, ¶ 51 quoting Pang v. Minch , 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), at paragraph four of the syllabus.
{¶ 113} Finally, Affinity argues counsel for Wayt violated the separation of witnesses rule. The trial court found the transcript showed Affinity withdrew its objection to the question it claimed evidenced attorney misconduct. We reach the same conclusion upon our review of the transcript.
{¶ 114} The trial transcript shows counsel for both parties zealously represented their clients. In this case, we agree with the trial court's finding that the statements and conduct of counsel for Wayt were not so prejudicial to arouse passion or prejudice warranting a new trial.
Weight of the Evidence
{¶ 115} Affinity argues the jury's verdict in favor of Wayt was not sustained by the weight of the evidence. In ruling on a motion for new trial on the grounds that the judgment is not sustained by the weight of the evidence, the trial court must engage in a limited weighing of the evidence and must consider the credibility of the witnesses. Woodburn v. Motorist Mut. Ins. Group , 5th Dist. Stark No. 2014CA00140, 2015-Ohio-2885, 2015 WL 4389630, ¶ 25 citing Rohde v. Farmer , 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraph three of the syllabus. This requires the trial court to exercise its discretion, and an order granting or denying a new trial on this basis will not be reversed absent an abuse of discretion. Antal v. Olde Worlde Prods., Inc. , 9 Ohio St.3d 144, 145, 459 N.E.2d 223 (1984).
{¶ 116} In its motion for new trial, Affinity raised three arguments to support its contention the jury's findings in favor of Wayt on her defamation claims were not sustained by the weight of the evidence. First, it addressed the September 13, 2012 meeting. Affinity stated Wayt's defamation claim based on the September 13, 2012 meeting was entirely reliant upon the presence of Robert McKinney, Wayt's union representative. It was allegedly McKinney who relayed the information published to him at the meeting to other hospital staff and community. At trial, however, McKinney testified he could not remember everything that was said at the *927 September 13, 2012 meeting or what he said about the September 13, 2012 meeting to others. (T. 1332). McKinney testified he spoke with hospital employees and Michelle Mohan after the September 13, 2012 meeting. (T. 1338-1339).
{¶ 117} In its motion denying the motion for new trial, the trial court found that while McKinney could not remember what statements he made, there was circumstantial evidence to support the jury's conclusion that McKinney published defamatory statements. Michelle Mohan testified she spoke with McKinney after the September 13, 2012 meeting. (T. 1405). Other hospital employees heard gossip in the hospital about Wayt's suspension. The trial court further found defamation occurred when Affinity published false statements in the presence of McKinney during the September 13, 2012 meeting. In so finding, the trial court cited to the Ohio Supreme Court's ruling in Hecht v. Levin , 66 Ohio St.3d 458, 1993-Ohio-110, 613 N.E.2d 585 (1993) :
The publication of defamatory matter is an essential element to liability for defamation. "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." 3 Restatement of the Law 2d, Torts (1965), Section 577(1). Any act by which the defamatory matter is communicated to a third party constitutes publication. Id. at Comment a. Also, it is sufficient that the defamatory matter is communicated to one person only, even though that person is enjoined to secrecy. See id. at Comment b. Ohio law recognizes that publication of defamation consists in communicating it to a person or persons other than the person libeled. Hahn v. Kotten (1975), 43 Ohio St.2d 237, 243, 72 O.O.2d 134, 138, 331 N.E.2d 713, 718.
{¶ 118} Our review of the trial transcript supports the trial court's limited weighing of the evidence as to whether evidence from McKinney established defamation.
{¶ 119} Affinity next argued Angela Boyle's statement referring to Wayt being back to work per a court order was not defamatory. After Wayt's return to work, Mahon spoke with Boyle while in the presence of six nurses. Boyle told Mahon that just because there was an order or just because Wayt was back at work did not mean Wayt deserved her job back or was a good nurse. Affinity argued in its motion for new trial and on appeal that the statement was not presented until the seventh day of trial and the statement was not defamatory as a matter of law. In its motion for new trial, Affinity did not cite to any case law to support its argument the statement was not defamatory. Its appellate argument is likewise conclusory. Affinity discussed the matter more thoroughly in its motion for judgment notwithstanding the verdict and the trial court ruled on the matter in its judgment entry denying the JNOV.
{¶ 120} Finally, Affinity argued its reporting of the investigation to the Board of Nursing was proper and not defamatory. Bill Osterman testified he sent all information obtained by Affinity during the investigation to the Board for the Board to take into consideration. There was no testimony as to the process the Board of Nursing uses to determine whether to revoke or suspend a nursing license. The information sent to the Board of Nursing included a knowingly false statement that Wayt was not in the patient's room from the time of the patient's admission to 4:30 p.m., when in fact further investigation showed Wayt was with the patient at 10:00 a.m., 12:00 p.m., and 2:00 p.m. The inclusion of false information supported the jury's conclusion that Affinity was not entitled to immunity *928 for reporting to the Board of Nursing due to fraud or bad faith.
{¶ 121} The trial court did not abuse its discretion to find the jury's verdict in favor of Wayt was supported by the weight of the evidence.
Excessive Verdict
{¶ 122} Affinity also asked for a new trial pursuant to Civ.R. 59(A)(4). This section provides that a new trial may be granted on the following grounds: "(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice."
{¶ 123} An appellate court reviewing whether a trial court abused its discretion in ruling on a motion for a new trial pursuant to Civ.R. 59(A)(4) must consider (1) the amount of the verdict, and (2) whether the jury considered improper evidence, improper argument by counsel, or other inappropriate conduct which had an influence on the jury. Jeffrey Allen Industries, L.L.C. v. Manco , 5th Dist. Richland No. 13CA53, 2014-Ohio-268, 2014 WL 295758, ¶ 39-40 citing Dillon v. Bundy , 72 Ohio App.3d 767, 774, 596 N.E.2d 500 (10th Dist.1991). To support a finding of passion or prejudice, it must be demonstrated that the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities. Jeanne v. Hawkes Hosp. of Mt. Carmel , 74 Ohio App.3d 246, 257, 598 N.E.2d 1174, 1181 (10th Dist.1991). The mere size of the verdict is insufficient to establish proof of passion or prejudice. Jeanne , 74 Ohio App.3d at 257, 598 N.E.2d 1174. In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive. Moskovitz v. Mt. Sinai Med. Ctr. , 69 Ohio St.3d 638, 655, 635 N.E.2d 331 (1994).
{¶ 124} In a defamation action, damages may include impairment of reputation, personal humiliation, shame, mental anguish, and suffering. Isquick v. Dale Adams Enterprises, Inc. , 9th Dist. Summit No. 20839, 2002-Ohio-3988, 2002 WL 1800378, ¶ 37 citing Stokes v. Meimaris , 111 Ohio App.3d 176, 184, 675 N.E.2d 1289 (8th Dist.1996) Once a plaintiff makes a prima facie case of defamation, the amount of damages to award is a determination for the jury. Cooper v. Grace Baptist Church of Columbus, Ohio, Inc. , 81 Ohio App.3d 728, 736, 612 N.E.2d 357 (10th Dist.1992). A plaintiff is not required to "provide the jury with some precise formula by which they could calculate a damage award." Stokes , 111 Ohio App.3d at 186, 675 N.E.2d 1289.
{¶ 125} We have determined above the trial court was within its discretion to find the jury did not consider improper evidence and was not influenced by improper conduct in reaching its determination of damages. Wayt demonstrated that Affinity, through its employees, defamed Wayt through false statements about Wayt and her work performance. The false statements damaged Wayt's reputation and prevented her from being hired as a nurse in the community. The size of the verdict in this case does not prove passion or prejudice, but the jury's determination of the damages based on the evidence presented.
{¶ 126} We find the trial court did not abuse its discretion when it denied Affinity's motion for new trial. Affinity's eighth Assignment of Error is overruled.
Motion for Summary Judgment
{¶ 127} In Affinity's second Assignment of Error, it argues the trial court erred when it denied its motion for summary judgment. In Continental Ins. Co. v. Whittington , 71 Ohio St.3d 150, 159, 642 N.E.2d 615 (1994), the Ohio Supreme Court held:
*929 * * * [W]here a motion for summary judgment is denied upon a finding that genuine issues of material fact exist that must be determined at trial, and the subsequent trial on the issues raised in the motion supports a final judgment for the party against whom the motion was made, that final judgment is not be disturbed solely because it might have appeared before trial that no genuine issue of material fact existed.
{¶ 128} The matters raised in Affinity's motion for summary judgment against Wayt were raised at trial and final judgment was rendered in Wayt's favor. We found the verdict was not against the manifest weight of the evidence. Any error by the trial court in denying the motion for summary judgment is now moot.
{¶ 129} Affinity's second Assignment of Error is overruled.
IX. Directed Verdict and JNOV
{¶ 130} In its ninth Assignment of Error, Affinity contends the trial court erred when it denied its motion for directed verdict and motion for judgment notwithstanding the verdict.
{¶ 131} A trial court's decision on a motion for directed verdict presents a question of law, which an appellate court reviews de novo. Groob v. KeyBank , 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170. Civil Rule 50 provides for a motion for directed verdict, which may be made at the opening statement of the opponent, at the close of opponent's evidence, or at the close of all the evidence. Upon receiving the motion, the trial court must construe the evidence most strongly in favor of the party against whom the motion is directed. Civil Rule 50(A)(4). If the trial court finds on any determinative issue reasonable minds could come but to one conclusion on the evidence submitted, then the court shall sustain the motion and direct the verdict as to that issue. A directed verdict is appropriate where a plaintiff fails to present evidence from which reasonable minds could find in plaintiff's favor. See Hargrove v. Tanner , 66 Ohio App.3d 693, 586 N.E.2d 141 (9th Dist. 1990).
{¶ 132} The standard for granting a motion for judgment notwithstanding the verdict under Civil Rule 50(B) is the same used for granting a Civil Rule 50(A) directed verdict. Texler v. D.O. Summers Cleaners & Shirt Laundry Co. , 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998) ; Wagner v. Roche Laboratories , 77 Ohio St.3d 116, 121, 671 N.E.2d 252, 256 (1996). In other words, as long as substantial competent evidence supports the non-moving party, and reasonable minds could reach different conclusions about that evidence, the motion must be denied. See Strother v. Hutchinson , 67 Ohio St.2d 282, 284-85, 423 N.E.2d 467 (1981) ; Posin v. A.B.C. Motor Court Hotel, Inc. , 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). In reviewing a motion for JNOV, courts do not consider the weight of the evidence or the witness credibility; rather, courts consider the much narrower legal question of whether sufficient evidence exists to support the verdict. Texler v. D.O. Summers Cleaners & Shirt Laundry Co. , 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998) ; Wagner v. Roche Laboratories , 77 Ohio St.3d 116, 121, 671 N.E.2d 252, 256 (1996).
{¶ 133} Affinity raised similar arguments in its JNOV as it did in its motion for new trial. It argued in its motion for JNOV: (1) the statements at the September 13, 2012 meeting were not defamatory, (2) the statements made in the September 13, 2012 meeting were not published for purposes of defamation, (3) Angela Boyle's statements were not defamation, (4) the communications at the September 13, 2012 meeting were covered by a qualified privilege and Affinity acted in good faith, and (5) Wayt was not entitled to punitive damages *930 or attorney's fees because her defamation claim failed as a matter of law.
{¶ 134} Affinity raised the majority of the above arguments as separate Assignments of Error and/or in its motion for new trial, which we have addressed. In its motion for JNOV, however, Affinity more thoroughly argued its position that Angela Boyle's statement regarding Wayt's return to work was not a defamatory statement, but rather a protected opinion.
{¶ 135} At trial, Michelle Mohan testified on direct examination, "And she replied that just because there was a federal court order or just because Ann's back here at work does not mean in any way that Ann is-deserves her job back or that she's a good nurse. And, that they don't, that they-that means anything at all." (T. 1441). Affinity did not object to Mohan's testimony. The statement made by Angela Boyle and testified to by Mohan was one of the defamatory statements Wayt claimed to have caused her injury. In a jury interrogatory, eight jurors found the statement to be defamatory.
{¶ 136} Affinity argued in its motion for JNOV that Angela Boyle's statement was a protected opinion and therefore not defamatory. To be defamatory, a statement must be a statement of fact and not of opinion. Gilson v. Am. Inst. of Alternative Medicine , 2016-Ohio-1324, 62 N.E.3d 754, ¶ 52 (10th Dist.) citing Fuchs v. Scripps Howard Broadcasting Co. , 170 Ohio App.3d 679, 2006-Ohio-5349, 868 N.E.2d 1024, ¶ 39 (1st Dist.), citing Vail v. Plain Dealer Publishing Co. , 72 Ohio St.3d 279, 649 N.E.2d 182 (1995). "Statements of opinion are protected speech under the Ohio Constitution." Id. , citing Vail . Whether an alleged defamatory statement is fact or opinion "is a question of law for the court." Wampler v. Higgins , 93 Ohio St.3d 111, 127, 752 N.E.2d 962 (2001).
{¶ 137} The Tenth District Court of Appeals in Gilson v. Am. Inst. of Alternative Medicine , 2016-Ohio-1324, 62 N.E.3d 754 (10th Dist.) explained the analysis used to determine whether a statement was fact or opinion:
Courts apply a totality-of-the-circumstances test to determine whether a statement is a statement of fact or of opinion. See Vail ; Scott v. News-Herald , 25 Ohio St.3d 243, 496 N.E.2d 699 (1986). In reviewing the totality of the circumstances, courts should examine the following four factors: (1) the specific language used, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appears. Id. at 250, 496 N.E.2d 699. "This analysis is not a bright-line test," Vail at 282, 649 N.E.2d 182, "[t]he weight given to any one factor under this inquiry will vary depending on the circumstances of each case." Wampler at 126, 752 N.E.2d 962.37 {¶ 54} In applying the four-part test, courts apply "an objective, reasonable-reader standard." McKimm v. Ohio Elections Comm. , 89 Ohio St.3d 139, 144, 729 N.E.2d 364 (2000). "All four factors of Ohio's test for distinguishing a statement of fact from an opinion depend on the reasonable reader's perception of the statement-not on the perception of the publisher." Id. , citing Vail at 282-83, 649 N.E.2d 182. See Id. at 145, 729 N.E.2d 364 (noting that in the absence of a reasonable reader standard, "publishers of false statements of fact could routinely escape liability for their harmful and false assertions simply by advancing a harmless, subjective interpretation of those statements").
Statements which might appear to be statements of opinion "may often imply an assertion of objective fact." Jacobs at 119, 573 N.E.2d 609. Thus, for example, *931 "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." Milkovich v. Lorain Journal Co. , 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). " '[I]f an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact.' " Scott at 251, 496 N.E.2d 699, quoting Hotchner v. Castillo-Puche , 551 F.2d 910, 913 (2d Cir.1977).
Gilson, supra at ¶¶ 53-55.
{¶ 138} Considering the totality of the circumstances and the four factors, the trial court found Angela Boyle's statement was not an expression of opinion, but an assertion of fact. Based on our review of the testimony, the context in which the statement was made, and the impact of Angela Boyle's position of director of human resources, we find the trial court's conclusion that a reasonable listener would construe Boyle's statement as fact, not opinion, is supported by the record.
{¶ 139} We find the trial court did not err in denying Affinity's motion for directed verdict or motion for JNOV. The record shows there was substantial competent evidence to support the non-moving party, and reasonable minds could reach different conclusions about that evidence. Affinity's ninth Assignment of Error is overruled.
X. Damages Caps
{¶ 140} Affinity argues in its tenth Assignment of Error that the trial court erred when it failed to apply caps on noneconomic tort damages set out in R.C. 2315.18(B)(2) and caps on punitive damages set out in R.C. 2315.12(D). Affinity contends the trial court should have reduced the jury's noneconomic damage award from $800,000 to $250,000 and the jury's punitive damage award from $750,000 to $500,000.
{¶ 141} It is a matter of first impression whether a jury award of noneconomic and punitive damages based on a claim of defamation is subject to statutory damages caps. The resolution of this issue requires an examination of the R.C. 2315.18 and 2315.12. Questions of statutory interpretation are questions of law, which are reviewed de novo. Riedel v. Consol. Rail Corp., 125 Ohio St.3d 358, 2010-Ohio-1926, ¶ 6, 928 N.E.2d 448 (2010). In construing a statute, the primary goal "is to ascertain and give effect to the intent of the legislature as expressed in the statute." Hudson v. Petrosurance, Inc. , 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 30. "The first rule of statutory construction is to look at the statute's language to determine its meaning. If the statute conveys a clear, unequivocal, and definite meaning, interpretation comes to an end, and the statute must be applied according to its terms." Columbia Gas Transmission Corp. v. Levin , 117 Ohio St.3d 122, 882 N.E.2d 400, 2008-Ohio-511 at ¶ 19, citing Lancaster Colony Corp. v. Limbach , 37 Ohio St.3d 198, 199, 524 N.E.2d 1389 (1988). Courts may not delete words used or insert words not used. Cline v. Ohio Bur. of Motor Vehicles , 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991).
{¶ 142} The parties argued the issue of damage caps to the trial court through written motions and oral argument. On August 28, 2015, the trial court issued its judgment entry overruling Affinity's motion to apply applicable damage caps. The record reflects the trial court's ruling was uniquely thorough, well reasoned, and all encompassing in finding the damage caps set forth in R.C. 2315.18 and 2315.21 did not apply to an award of damages for injury to reputation. Based on our de novo review of the relevant statutory language, the parties' motions, oral arguments, and appellate arguments, we concur R.C. 2315.18 and 2315.21 do not apply to cap *932 noneconomic and punitive damages awarded in a defamation claim. Wherefore, we hereby adopt the trial court's August 28, 2015 judgment entry in its entirety, attached hereto as Appendix A, and restate it as if fully rewritten herein.
{¶ 143} Affinity's tenth Assignment of Error is overruled.
CONCLUSION
{¶ 144} The judgment of the Stark County Court of Common Pleas is affirmed.
Gwin, J. and Earle Wise, J., concur.
APPENDIX A
IN THE COURT OF COMMON PLEAS STARK COUNTY, OHIO ANN WAYT CASE NO. 2012CV3479 Plaintiff, JUDGE TARYN L. HEATH, vs. DHSC, LLC, dba AFFINITY JUDGMENT ENTRY MEDICAL CENTER (Denying Defendant's Motion to Apply Applicable Damage Caps and Entering Judgment for Plaintiff) Defendant.
This matter came before the Court upon Defendant, DHSC, LLC dba Affinity Medical Center's ("Defendant") Motion to Apply Applicable Damage Caps. Plaintiff, Ann Wayt ("Plaintiff") filed a Memorandum Contra and Defendant filed a Reply. This Court then conducted an Oral Hearing on the Motion. Following the Oral Hearing Plaintiff filed a Motion for Leave to file a Post Hearing Brief on the damage cap issue which was opposed by Defendant. This Court granted the Motion for Leave and Plaintiff's Post Hearing Brief was filedinstanter.
I. INTRODUCTION
A. Factual Background
Plaintiff has been a registered nurse since 1976 and was employed by DHSC, LLC dba Affinity Medical Center ("Affinity") since 1987. This case arose from Affinity employees' statements as they related to Plaintiff. Throughout Plaintiff's career with Affinity she was recognized as an outstanding nurse; was the recipient of multiple awards; had never once been disciplined; and was featured by Affinity in its advertising.
*933 In 2012 Plaintiff and several nurses employed by Affinity began efforts to unionize the nurses for the purpose of improving patient care and safety and to establish guidelines for staff to patient ratios. As a result of her lengthy and outstanding nursing career, Plaintiff was viewed by some as a leader in the drive for union recognition.
Plaintiff alleged that in 2012, in retaliation for her open support of unionization, a number of Affinity employees accused her of patient neglect, falsification of medical records, substandard work, failing to comply with hospital policy, and violations of the Health Insurance Portability and Accountability Act (HIPAA). Plaintiff asserted that the Affinity employees knew that the aforementioned charges were false. Affinity employees also reported the aforementioned charges to the Ohio Board of Nursing, subjecting the Plaintiff to investigation, discipline, the possible loss of her license, and even potential criminal charges.
B. Procedural Background
Plaintiff filed the present case against several Affinity employees as well as Affinity. Plaintiff later dismissed the individual defendants and several of the claims against Affinity and proceeded on claims of defamation, spoliation of evidence, and punitive damages. Affinity filed a Motion to Bifurcate the punitive damages claim from the rest of Plaintiff's claims and this Court granted said Motion.
This case proceeded to a jury trial on the defamation and spoliation of evidence claims. Prior to the closing arguments, Plaintiff withdrew the spoliation of evidence claim. Ultimately, after two weeks of trial and deliberation the jury rendered a unanimous verdict in favor of Plaintiff on her defamation claim and awarded Plaintiff $800,000.00 in compensatory damages. Upon Affinity's request, the jury was given eight interrogatories and verdict forms. Interrogatories 1-6 tested whether Plaintiff had proven by a preponderance of the evidence that *934 each of the statements[1] was defamatory and whether Plaintiff had proven by clear and convincing evidence that Affinity acted with actual malice in making the statements.WAYT v. DHSC, LLC, DBA AFFINITY MEDICAL CENTER, Stark County Court of Common Pleas, 2012CV03479, Jury Interrogatory 1-6. Interrogatory 7 tested whether Plaintiff had proven "by a preponderance of the evidence that Defendant, through its employee William Osterman acted with fraud or in bad faith in making any of the 5 statements referenced in the jury instructions about Plaintiff to the State of Ohio Board of Nursing."Id., Jury Interrogatory 7. Interrogatory 8 simply verified the jury's damage award.
Plaintiff's punitive damages claim was then tried to the same jury. Interrogatory 1 tested whether Plaintiff had proven
by clear and convincing evidence that Defendant's acts or failures to act demonstrated malice, aggravated or egregious fraud, oppression, or insult; or the defendant as employer authorized, participated in, or ratified acts or failures to act of an agent or employee that demonstrated malice, aggravated or egregious fraud, oppression or insult.
Id., Jury Interrogatory 1 Related to Plaintiff's Claim for Punitive Damages. The jury unanimously awarded Plaintiff $750,000.00 in punitive damages and further found that Plaintiff had proven, "by clear and convincing evidence that the Defendant is liable for reasonable attorney fees of Plaintiff's attorney."Id., Jury Interrogatory 3 Related to Plaintiff's Claim for Punitive Damages.
Following the jury verdict and damage award, Plaintiff filed a Motion for Attorney Fees as well as a Motion for Prejudgment Interest. Affinity responded to both motions and Plaintiff filed replies in support of both motions. The Court shall address Plaintiff's Motion for Prejudgment Interest in a separate Order. Counsel for the parties reached a stipulation regarding attorney fees.Id., Stipulated Judgment Entry.
*935 Affinity filed the within Motion to Apply Applicable Damage Caps to the jury's non-economic damage award to reduce said award from $800,000.00 to $250,000.00 pursuant to R.C. 2315.18 and to reduce the jury's punitive damage award from $750,000.00 to $500,000.00 pursuant to R.C. 2315.21(D). Plaintiff has asserted that the statutory damage caps do not apply in the present matter due to the Ohio Legislature specifically and repeatedly limiting the damage caps only to "civil actions for damages for injury or loss to person or property" and not civil actions for injury to reputation, such as Plaintiff's defamation claim. Plaintiff has also asserted that the Ohio Constitution and the Ohio Supreme Court have always separately distinguished injuries to "person", "property", or "reputation" and have acknowledged that injury to "reputation" stands alone and is not part of an injury to person or property. Consequently, Plaintiff asserts that the legislative failure to include "injury to reputation" in the damage cap statutes dictates that an award of damages for the separate and distinct injury to reputation is not subject to the statutory damage caps set forth in R.C. 2315.18 and R.C. 2315.21.
II. ANALYSIS
A. R.C. 2315.18(B)-Noneconomic Damages Cap
To determine the applicability of R.C. 2315.18 to actions for injury to reputation such as Plaintiff's defamation claim this Court must interpret R.C. 2315.18. The relevant portions of R.C. 2315.18 state:
(A) As used in this section and in section 2315.19 of the Revised Code:
* * *
(4) Noneconomic loss means nonpecuniary harm that results from an injury or loss to person or property that is a subject of a tort action, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss.
*936 (5) Occurrence means all claims resulting from or arising out of any one person's bodily injury.
* * *
(7) Tort action means a civil action for damages for injury or loss to person or property. Tort action includes a civil action upon a product liability claim or an asbestos claim. Tort action does not include a civil action upon a medical claim, dental claim, optometric claim, or chiropractic claim or a civil action for damages for a breach of contract or another agreement between persons.
* * *
(B) In a tort action to recover damages for injury or loss to person or property, all of the following apply:
* * *
(2) Except as otherwise provided in division (B)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action under this section to recover damages for injury or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort action.
(3) There shall not be any limitation on the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action to recover damages for injury or loss to person or property if the noneconomic losses of the plaintiff are for either of the following:
(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;
(b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities.
* * *
(G) With respect to a tort action to which division (B)(2) of this section applies, any excess amount of compensatory damages for noneconomic loss that is greater than the applicable amount specified in division (B)(2) of this section shall not be reallocated to any other tortfeasor beyond the amount of compensatory damages that the tortfeasor would otherwise be responsible for under the laws of this state.
*937 The applicability of R.C. 2315.18 to actions for injury to reputation such as defamation claims has never been addressed by the Ohio Supreme Court or in any Ohio case law. Therefore, this Court shall apply the rules of statutory construction to determine whether R.C. 2315.18 applies to limit a jury's compensatory damages award in actions for injury to reputation such as defamation claims.
1. Statutory Interpretation
An appellate court's "interpretation of a statute is conducted under a de novo standard of review because statutory interpretation is a matter of law."State v. Huston, 10th Dist. Franklin No. 04AP-466, 2004-Ohio-6069, ¶ 4 citingState v. Wemer, 112 Ohio App.3d 100, 103 (4th Dist.1996). R.C. 1.42 states that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." R.C. 1.47 provides that, "[i]n enacting a statute, it is presumed that: (A) Compliance with the constitutions of the state and of the United States is intended; (B) The entire statute is intended to be effective; (C) A just and reasonable result is intended; (D) A result feasible of execution is intended."
In addition to statutory law setting forth the rules of statutory construction, the Ohio Supreme Court has made clear in construing a statute, a court's primary concern is the legislative intent in enacting the statute.Rice v. CertainTeed Corp., 84 Ohio St.3d 417 (1999). "In order to determine legislative intent it is a cardinal rule of statutory construction that a court must first look to the language of the statute itself."State v. Jordan, 89 Ohio St.3d 488, 492 (2000). If the statutory language is plain and unambiguous, the Supreme Court of Ohio has stated that "it is the duty of this court to give effect to the words used [in a statute], not to delete words used or to insert words not used."Columbus-Surburban *938 Coach Lines v. Pub. Util. Comm., 20 Ohio St.2d 125, 127 (1969). "Statutes that explicitly refer to each other are read in pari materia so as to give effect to each statute."Faieta v. World Harvest Church, 10th Dist. Franklin No. 08AP-527, 2008-Ohio-6959, ¶ 89 citingBrooks v. Ohio State Univ., 111 Ohio App.3d 342, 349 (10th Dist.1996).
a. Language of R.C. § 2315.18 is Not Inclusive of All Tort Actions
R.C. 2315.18 is not applicable to all tort actions based upon the statute's plain and unambiguous language. In applying the rules of statutory construction this Court first looks at the plain language of the statute in which a "tort action" is specifically limited to "a civil action for damages for injury or loss to person or property." R.C. 2315.18(A)(7). The plain language of the statute repeatedly indicates that the statute does not apply to "all" tort actions, but rather is limited to those tort actions where the damages sought to be recovered are "damages for injury or loss to person or property". R.C. 2315.18. The plain language found in section (G) which limits reallocation of compensatory damages "[w]ith respect to a tort action to which division (B)(2) of this section applies..." is another example of the legislative intent to limit applicability of the statute to only certain tort actions.Id. If the statute applied to "all" torts the legislature would not have limited section (G) to those "tort actions to which division (B)(2) applied".Id. The plain language of the statute makes it clear that the statute does not apply to "all" tort actions.
Further, the language of R.C. 2315.18 specifically delineates certain actions that are and are not affected. Defamation actions are not specifically included in the statute's list of actions to which it applies but are also not specifically excluded. In applying the rules of statutory construction, a court cannot delete words used or insert words not used. Therefore, based upon the fact that the legislature specifically excluded certain actions and included certain actions, this Court cannot now insert an action for defamation, when clearly the legislature could have done *939 so when the statute was drafted had it intended to include defamation. The legislative intent based upon the plain language of R.C. 2315.18 was that the statute was not to be applied in defamation tort actions. Therefore the jury's compensatory damages award of $800,000.00 shall stand undisturbed.
b. Injury to Reputation is a Separate and Distinct Injury from "injury or loss to person or property" and is Excluded from R.C. 2315.18
i. Ohio Constitution and Ohio Supreme Court
The Ohio Constitution specifically indicates that a person can suffer injury in three separate and distinct ways, i.e., injury to person, injury to property (lands or goods), or injury to reputation. The Ohio Constitution specifically provides that "all courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law, and shall have justice administered without denial or delay." Ohio Constitution, Article I, Section 16.
Additionally, the Ohio Supreme Court inArbino v. Johnson & Johnson discussed the above quoted section of the Ohio Constitution when it held the statutory damage caps as set forth in R.C. 2315.18 and R.C. 2315.21 constitutional.Arbino v. Johnson & Johnson, 116 Ohio St.3d 468, 2007-Ohio-6948, syllabus. Specifically, inArbino the Ohio Supreme Court stated "[t]he definition of these rights is well-settled. `When the Constitution speaks of a remedy and injury to person, property, or reputation, it requires an opportunity granted at a meaningful time and in a meaningful manner.'"Id. at 477 quotingHardy v. VerMeulen, 32 Ohio St.3d 45, 47 (1987). While the court inArbino held that R.C. 2315.18 and R.C. 2315.21 were constitutional, the action inArbino was a personal injury action and thus the Ohio Supreme Court was not dealing with the applicability of the statutes to a civil action to recover damages for injury to reputation such as defamation actions.
*940 R.C. 2315.18 specifically states eleven times, "injury or loss to person or property." Presumably, the legislative drafters of this statute were familiar with the Ohio Constitution and its recognition of the various ways a person can suffer injury. Based upon the fact that the legislature specifically capped damages for "injuries or loss to person or property" without including injury to reputation, i.e., the damages arising from a defamation tort, it is clear that the statute is not applicable to defamation claims.
ii. Bodily Injury vs. Reputation Injury
The statutory language of R.C. 2315.18(A)(5) defines "occurrence" as "all claims resulting from or arising out of any one person'sbodily injury. " (Emphasis added.) R.C. 2918(A)(5). In decisions that have formed the foundation for federal and state defamation law the United States Supreme Court has consistently recognized the injury inflicted by defamatory falsehood to include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.New York Times Co. v. Sullivan, 376 U.S. 254 (1964);Curtis Publishing Co. v. Butts, 388 U.S. 130, 162-165 (1967);Gertz v. Robert Welsh, Inc., 418 U.S. 323, 345-46 (1974). Absent from the United States Supreme Court's recognized injury inflicted by defamatory falsehood is bodily injury.
Pursuant to Ohio Supreme Court case law, "[D]efamation occurs when a publication contains a false statement `made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'"Jackson v. Columbus, 117 Ohio St.3d 328, 2008-Ohio-1041, ¶ 9 quotingA & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council, 73 Ohio St.3d 1, 7 (1995). Again, absent from the Ohio Supreme Court's recognized defamation injuries is bodily injury.
*941 Finally, pursuant to the Restatement of Law 2d:
The tort law of libel and slander has been conceived of as serving three separate functions: 1) to compensate the plaintiff for injury to his reputation, for his pecuniary losses and for his emotional distress, 2) to vindicate him and aid in restoring his reputation and 3) to punish the defendant and dissuade him and others from publishing defamatory statements.
Restatement of the Law 2d, Torts, unnumbered section entitled "Special Note on Remedies for Defamation (Other Than Damages)" following Section 623, at 326 (1977). Once again, bodily injury is not mentioned in any way with regard to the tort law of libel and slander.
According to precedence of the United States Supreme Court and the Ohio Supreme Court and Restatement of Law 2d, defamation claims do not result from or arise out of any person's bodily injury, rather defamation claims result from or arise out of injury to a person's reputation.New York Times Co., supra. ;Curtis Publishing Co., supra ;Gertz, Inc., supra. ;Jackson, supra. ; Restatement of Law 2d, Torts,supra. As stated above, pursuant to the Ohio Constitution and the Ohio Supreme Court, injury to a person's reputation is distinctive and separate from injury to a person's body. Therefore, based upon the definition of occurrence in the statute which fails to reference injury to a person's reputation and the statutory language that caps damages "for each occurrence," it is evident that defamation damages were not intended by the legislature to be included in the statutory damages cap.
iii. Injuries Arising From R.C. 2315.18 Excluded Claims
As previously discussed, the statutory language of R.C. 2315.18(A)(7) defines a "tort action" as "a civil action for damages for injury or loss to person or property." To further clarify actions to which R.C. 2315.18 applies, the legislature included language setting forth specific actions "included" and "excluded". R.C. 2315.18(A)(7) states:
`Tort Action' includes a civil action upon a product liability claim or an asbestos claim. `Tort Action' does not include a civil action upon a medical claim, dental claim, optometric claim, or chiropractic claim or a civil action for damages for a breach of contract or another agreement between persons.
*942 Additional actions excluded from the statute's application are set forth in section H of R.C. 2315.18, which states:
This section does not apply to any of the following:
(1) Tort actions that are brought against the state in the court of claims, including, but not limited to, those actions in which a state university or college is a defendant and to which division (B)(3) of section 3345.40 of the Revised Code applies;
(2) Tort actions that are brought against political subdivisions of this state and that are commenced under or are subject to Chapter 2744. of the Revised Code. Division (C) of section 2744.05 of the Revised Code applies to recoverable damages in those actions.
(3) Wrongful death actions brought pursuant to Chapter 2125.
All of the actions that the legislature specifically included or excluded in R.C. 2315.18 contemplate damages for "injury or loss to person or property". For example, products liability and asbestos claims involve damages for injury or loss to person, (i.e. bodily injury) or injury or loss to property (i.e. land or goods). However, the aforementioned claims are addressed in other statutes, necessitating language reflective of the legislative intent that the damages cap set forth in R.C. 2315.18 was applicable to said claims. Additionally, medical, dental, optometric, or chiropractic claims all involve damages for injury or loss to person (i.e. bodily injury). Since the damages cap would otherwise apply to the aforementioned claims based upon the plain language of R.C. 2315.18, it was necessary for the legislature to specifically exclude them from the statute's application to avoid conflict with other statutes that address damages for those claims. Further, actions for damages for a breach of contract or another agreement between persons typically arise from injury or loss to property (i.e. injury or loss to lands or goods). Therefore, similar to the above examples, it was necessary for the legislature to specifically exclude them *943 from the statute's application. Finally, the excluded tort actions found under R.C. 2315.18(H) result in damages for injury or loss to person or property and therefore the legislature had to make clear its intent that the damages cap not apply to said actions.
As previously stated, absent from the delineated actions to which the statute does and does not apply are defamation actions. It was not necessary for the legislature to specifically include or exclude defamation actions because the plain language of the statute already makes clear that it is not applicable to damages for injury to reputation as opposed to injury to person or property. Therefore it is clear that the legislative intent was that R.C. 2315.18 not apply to cap damages awarded in defamation claims and this Court finds the jury's compensatory damages award of $800,000.00 shall stand undisturbed.
c. Defamation Damages Presumed
Further evidence that noneconomic damages awarded in a defamation claim are not to be capped pursuant to R.C. 2315.18 exists in the standard of proof necessary for a finder of fact to award damages in a defamation claim. In defamation per se cases in which the plaintiff is a private figure involving a public issue, such as the present action, the plaintiff must prove by clear and convincing evidence that the defendant acted with "actual malice" for damages to be presumed.Dun Bradstreet, Inc. v. Greenmoss Builders, 472 U.S. 749 (1985). Pursuant to Ohio Jury Instructions[2] if the finder of fact determines
*944 that the plaintiff proved by clear and convincing evidence the defendant acted with actual malice, it is assumed that the plaintiff's reputation was injured, and you may award the plaintiff an amount of money that you decide is reasonable and fair for the plaintiff's injury or injuries directly caused by the defamatory statement. Ohio Jury Instructions, CV Section 431.07(2)(A) (Rev. 9-13-03); see also Gertz v. Robert Welsh, Inc., 418 U.S. 323, 349-50 (1974). Once a plaintiff makes a prima facie case of defamation, the amount of damages to award is a determination for the jury. Isquick v. Dale Adams Enterprises, Inc., 9th Dist. Summit No. 20839, 2002-Ohio-3988, ¶ 37 citing Cooper v. Grace Baptist Church of Columbus, Ohio, Inc., 81 Ohio App.3d 728, 736 (10th Dist.1992). Moreover, a plaintiff is not required to `provide the jury with some precise formula by which they could calculate a damage award.' Isquick, 2002-Ohio-3988 at ¶ 37 quoting Stokes v. Meimaris, 111 Ohio App.3d 176, 186 (8th Dist.1996).
Additionally, there are no jury instructions or case law restricting the finder of fact in a defamation case from considering any of the factors as set forth in R.C. 2315.18(C): "(1) Evidence of a defendant's alleged wrongdoing, misconduct, or guilt; (2) Evidence of the defendant's wealth or financial resources; (3) All other evidence that is offered for the purpose of punishing the defendant, rather than offered for a compensatory purpose." When R.C. 2315.18 and R.C. 2315.21 were enacted the General Assembly made a "statement of findings and intent".See Am.Sub.S.B. No. 80, Section 3(A)(6), 2004 Ohio Laws File 144. In issuing its findings and intent regarding noneconomic damages the General Assembly stated the following in Section 3(A)(6):
(a) ... Pain and suffering awards are intended to compensate a person for the person's loss. They are not intended to punish a defendant for wrongful conduct.
* * *
(c) With respect to noneconomic loss for either: (1) permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system; or (2) permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities, the General Assembly recognizes that evidence that juries may consider in awarding pain and suffering damages for these types of injuries is different from evidence courts may consider for punitive damages. For example, the amount of a plaintiff's pain and suffering is not relevant to a decision on wrongdoing, and the degree of the defendant's wrongdoing is not relevant to the amount of pain and suffering.
*945 (d) While pain and suffering awards are inherently subjective, it is believed that this inflation of noneconomic damages is partially due to the improper consideration of evidence of wrongdoing in assessing pain and suffering damages.
(e) Inflated damage awards create an improper resolution of civil justice claims. The increased and improper cost of litigation and resulting rise in insurance premiums is passed on to the general public through higher prices for products and services.
(f) Therefore, with respect to the types of injuries articulated in division (A)(6)(c) of this section, the General Assembly finds that courts should provide juries with clear instructions about the purpose of pain and suffering damages. Courts should instruct juries that evidence of misconduct is not to be considered in deciding compensation for noneconomic damages for those types of injuries. Rather, it is to be considered solely for the purpose of deciding punitive damage awards.
Contrary to both the language of R.C. 2315.18(C) and the legislative intent, the Restatement Law 2d, which is quoted in the Ohio Jury Instructions states "The tort law of libel and slander has been conceived as of serving three separate functions: * * * 2) to vindicate [the plaintiff] and aid in restoring his reputation and 3) to punish the defendant and dissuade him and others from publishing defamatory statements." Restatement of the Law 2d, Torts, unnumbered section entitled "Special Note on Remedies for Defamation (Other Than Damages)" following Section 623, at 326 (1977). Pursuant to the Ohio Jury Instructions and based upon the agreement of counsel for the parties herein this Court instructed the jury as follows: "You must put aside all passion, prejudice, personal dislikes, hatred or anger. Youmay take into considerationall facts and circumstances in evidence to decide the amount of these damages." (Emphasis added.)Ohio Jury Instructions, CV 431.07(2)(B) (Rev. 9-13-03). There was no request for a jury instruction restricting what the jury could consider in awarding compensatory damages for noneconomic loss.
In defamation cases, the finders of facts have the ability to award damages based upon vindicating the plaintiff, punishing the defendant and dissuading the defendant and others from publishing defamatory statements. This ability under the law is in direct contravention to both the language in R.C. 2918(C) setting forth what a finder of fact cannot use to determine *946 noneconomic damages and the legislative intent clearly expressed in Section 3 of S.B. 80. Therefore it is clear that the legislative intent was that R.C. 2315.18 not apply to cap damages awarded in defamation claims and this Court finds the jury's compensatory damages award of $800,000.00 shall stand undisturbed.
2. Separate Occurrences
R.C. 2315.18(B)(2) limits noneconomic damages "for each occurrence that is the basis of that tort action." InSimpkins v. Grace Brethren Church of Delaware, the Fifth District addressed the issue of whether the plaintiff's injury from rape arose out of a single "occurrence," for purposes of capping damages for noneconomic loss for each occurrence pursuant to R.C. 2315.18(B)(2).Simpkins v. Grace Brethren Church of Delaware, 2014-Ohio-3465, 16 N.E.3d 687 (5th Dist.). InSimpkins the plaintiff argued that "the trial court erred in finding that she suffered a single "injury or loss" for purposes of R.C. 2315.18 because she suffered two distinct occurrences."Id. at ¶ 92. It was also argued inSimpkins that despite the constitutionality of Ohio's damage cap statute, "the trial court erred when it applied the cap to two separate `occurrences' because it violates her rights under the `open courts' and `right to a remedy' provision of the Ohio Constitution."Id. at ¶ 94. Finally, the plaintiff inSimpkins asserted that theArbino court upheld the constitutionality of the statute because R.C. 2315.18 operates as a limitation on damages not a complete denial of a remedy to an injured person."Id. The Fifth District found that the plaintiff's "argument assumes that she sustained two separate incidents and is not compensated for one of them."Id. at ¶ 95. The Fifth District also found that
the oral and vaginal penetration in this case occurred within a short period of time, in a confined geographic space, and without any intervening factors. The testimony of Smalldon supports the position that there is one indivisible injury as he testified that Simpkins' post-traumatic stress disorder is the direct result of the incident with Williams and he does not distinguish between the two actions.
*947 Id. at ¶ 93. Ultimately, the Fifth District held that there was "a single course of wrongful conduct at the same time and place and there is no evidence Simpkins suffered separate, different, or additional damage from any separate part of the sexual assault. Accordingly, the trial court did not err in determining a single cap applied for purposes of R.C. 2315.18."Id. at ¶¶ 95-96.
In the present action there are clearly separate occurrences of defamation that took place. This is demonstrated by the separate interrogatories (requested by the defendant) for each separate statement made by the defendant, which tested each occurrence of defamation. Further, each occurrence of defamation took place in a different setting and was made to a different individual(s) or entity (i.e. the Ohio Nursing Board). The instant case is therefore distinguishable from theSimpkins case in which there was only one setting and the alleged separate incidents occurred only a minute or so apart. Separate occurrences of defamation are also shown by the jury award of $800,000 which if divided by the number of defamatory statements equals $200,000 in damages awarded per statement or "occurrence".
Based upon there being separate occurrences of defamation that took place in the present action this Court finds that even if it is later determined that R.C. 2315.18 does apply to defamation claims, the damage cap is not applicable in the present action. Therefore, this Court finds the jury's compensatory damages award of $800,000.00 shall stand undisturbed.
B. R.C. 2315.21(D)-Punitive Damages Cap
Affinity has requested that this Court reduce the jury's punitive damage award from $750,000.00 to $500,000.00 pursuant to R.C. 2315.21(D), the amount that is two times the amount of the requested capped compensatory damages awarded to Plaintiff. Plaintiff disputes Affinity's calculation of the capped punitive-damages and has asserted that R.C. 2315.21 is not applicable to the jury's punitive damage award.
*948 In applying the rules of statutory interpretation as previously set forth and for the reasons stated above, this Court finds R.C. 2315.21 is not applicable in the present action and thus the jury's punitive damage award shall not be reduced. However, if R.C. 2315.21 is later determined to be applicable and if R.C. 2315.18 does limit Plaintiff's noneconomic damages to $250,000.00 despite the jury's determination that Plaintiff sustained compensatory injuries of $800,000.00, the difference between Plaintiff's capped and uncapped compensatory damages drastically affects the punitive damages calculation. Therefore this Court must interpret whether the legislature intended courts to apply the punitive damages cap upon the plaintiff's capped or uncapped compensatory damages.
R.C. 2315.21 states:
(D)(1) In a tort action, the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages.
(2) * * * all of the following apply regarding any award of punitive or exemplary damages in a tort action:
(a) The court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to division (B)(2) or (3) of this section.
(Emphasis added.) R.C. 2315.21(D). R.C. 2315.21(B)(2) refers to actions that are tried to a jury and states that "the jury shall return, a general verdict and, if that verdict is in favor of the plaintiff, answers to an interrogatory that specifies the total compensatory damages recoverable by the plaintiff from each defendant."
While R.C. 2315.21 sets forth a limitation that courts are to place on punitive or exemplary damages based upon the compensatory damages awarded, it does not expressly state whether such limitation is to be applied to the total, uncapped compensatory damages awarded *949 by the jury or upon the capped compensatory damages entered by the court pursuant to R.C. 2315.18. InFaieta v. World Harvest Church, the Tenth Appellate District addressed whether the statutory cap on punitive damages as set forth in R.C. 2315.21 was to be applied before or after the compensatory damages were capped pursuant to R.C. 2315.18.Faieta v. World Harvest Church, 10th Dist. Franklin No. 08AP-527, 2008-Ohio-6959. The Tenth Appellate District noted that the defendant's argument focused on the word "recoverable" in R.C. 2315.21(B)(2) and (3) and then made the following analysis:
R.C. § 2315.21(D)(2)(a) explicitly provides that the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to [R.C. 2315.21(B)(2) or (3)], are to be used to calculate the cap on punitive damages. Those statutory provisions refer to the uncapped, total compensatory damages the jury awarded. Both R.C. § 2315.21(B)(2) and (3) direct the trier of fact to make factual findings that specify the total compensatory damages to be awarded to the plaintiff from each defendant. R.C. 2315.21(B)(2) and (3) make no reference to statutory caps on damage awards, and R.C. § 2315.18(F)(2) precludes the trial court from informing the jury of the existence of statutory caps. The court applies statutory caps on compensatory damages only after the jury has rendered its verdict and made an award of compensatory damages in the case. See R.C. 2315.18(E)(1). Accordingly, we conclude the total compensatory damages referenced in R.C. 2315.21(B)(2) are the uncapped compensatory damages the jury awarded.
Id. at ¶ 90.
In addition to theFaieta court, the First District reached a similar conclusion in an analogous situation involving whether the statutory adjustment for a plaintiff's comparative negligence should be made before or after the statutory limitation on compensatory damages is applied.Guiliani v. Shehata, 2014-Ohio-4240, 19 N.E.3d 971 (1st Dist.). InGuiliani the First District stated:
Because the legislature explicitly indicated that a jury cannot be instructed regarding the existence of statutory caps on compensatory damages representing noneconomic loss as it applied to medical malpractice, it would be inconsistent with the substance of R.C. 2323.43(B)(3) to define recoverable damages as capped damages. Moreover, if the legislature had intended that the comparative negligence statute apply after the damage-cap statute, it could have explicitly provided for that in the damage-cap statute.
*950 Id. at ¶ 38. The First District noted inGuiliani that "courts in California, Maine, and Massachusetts have reached the same conclusion, holding that a jury's determination of comparative negligence should be applied before any statutorily mandated caps on damages are subtracted from the total amount of damages."Id. at ¶ 39;see also McAdory v. Rogers, 215 Cal.App.3d 1273 (1989);Atkins v. Strayhorn, 223 Cal.App.3d 1380 (1990);Brown v. Crown Equip. Corp., 2008 ME 186, 960 A.2d 1188, ¶ 25 (2008);Rodriquez v. Cambridge Housing Auth., 59 Mass.App.Ct. 127 (2003).
In the aforementioned decisions the common theme is for the court to adhere to a jury's factual findings and to leave them as undisturbed as possible before applying statutory limitations on damages. InGuiliani and similar out of state cases dealing with the same issue, the courts applied the jury's findings as to comparative fault prior to applying the statutorily mandated damages limitation.Id. InFaieta, a case dealing with the exact statutes at issue herein, the court found that the jury's compensatory damages award rather than the statutorily imposed capped compensatory damages award should be used in limiting the jury's punitive damages award.Faieta, 2008-Ohio-6959. Finally, in finding R.C. 2315.18 and R.C. 2315.21 constitutional, the Ohio Supreme Court inArbino held that:
So long as the fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body's findings, awards may be altered as a matter of law. There is no dispute that the right to a trial by jury does not extend to the determination of questions of law.* * * Thus, without violating the Constitution, a court may apply the law to the facts determined by a jury.* * * Courts must simply apply the limits as a matter of law to the facts found by the jury; they do not alter the findings of facts themselves, thus avoiding constitutional conflicts. * * * Because R.C. 2315.18 follows these principles, it does not offend the right to a trial by jury under Section 5, Article I of the Ohio Constitution.
*951 Arbino v. Johnson & Johnson, 116 Ohio St.3d 468, 2007-Ohio-6948, ¶ 37-42. In accordance with the above decisions, this Court finds it is necessary to apply the statutory punitive damages cap to the jury's uncapped award of compensatory damages to avoid ignoring or replacing the jury's findings of fact and thereby offending the right to a trial by jury.
Furthermore, upon review of R.C. 2315.21 this Court finds there is no reference to the compensatory damages cap and the statute specifically references "the total compensatory damages recoverable by the plaintiff" rather than the capped compensatory damages. Additionally, the language of R.C. 2315.18(F)(2) provides that "the court shall not instruct the jury with respect to the limit on compensatory damages for noneconomic loss described in [R.C. 2315.18(B)(2)], and neither counsel for any party nor a witness shall inform the jury or potential jurors of that limit." To give effect to both R.C. 2315.18 and R.C. 2315.21 it is necessary to read them in pari materia. In so doing and in accordance with the Tenth and First District decisions, this Court finds that based upon the legislature's explicit indication that a jury cannot be instructed regarding the existence of statutory caps on compensatory damages in R.C. 2915.18, and based upon R.C. 2315.21 not referencing the cap on compensatory damages, the punitive damages cap should be applied to the uncapped compensatory damages award. As the court similarly stated inGuiliani, if the legislature had intended that the punitive damages cap statute apply to the capped compensatory damages, it could have explicitly provided for that in the punitive damages cap statute.Guiliani, 2014-Ohio-4240.
For the reasons stated herein this Court finds R.C. 2315.21 not applicable in the present action. However, even if R.C. 2315.21 does apply, for all of the aforementioned reasons, this Court finds that Plaintiff is entitled to punitive damages from Affinity in the amount of two times *952 the total, uncapped compensatory damages awarded to Plaintiff. In the present action the jury awarded Plaintiff $800,000.00 in compensatory damages. Thus Plaintiff was entitled to a potential punitive damages award of $1,600,000.00. The actual punitive damages awarded to Plaintiff by the jury was $750,000.00, substantially less than two times the total, uncapped compensatory damages awarded to Plaintiff. Therefore, this Court finds Affinity's Motion to Apply Applicable Damage Caps to reduce the punitive damages award not well taken and the jury's punitive damages award of $750,000.00 shall stand undisturbed.
III. CONCLUSION
Based on the aforementioned reasons this Court finds the statutory caps on compensatory/noneconomic and punitive damages as set forth in R.C. 2315.18 and R.C. 2315.21 do not apply in the present action as a matter of law and thereforeIT IS ORDERED, ADJUDGED, AND DECREED that Affinity's Motion to Apply Applicable Damage Caps is herebyDENIED. The jury award of $800,000.00 in compensatory damages and $750,000.00 in punitive damages shall stand undisturbed.
IT IS SO ORDERED.
HON. TARYN L. HEATH c: Atty. Brian L. Zimmerman- via facsimile (330) 456-2434 Atty. Frank G. Mazgai/Atty. Emily Yoder- via facsimile (330) 670-7450